## LE ROY CLARK ET AL. *vs.* THE NATIONAL STEEL AND WIRE COMPANY.

Third Judicial District, Bridgeport, April Term, 1909.

BALDWIN, C. J., HALL, PRENTICE, THAYER and RORABACK, JS.

The fact that a majority of the stockholders of a manufacturing corporation see fit to put their shares of stock into a voting trust for several years, pursuant to an agreement between themselves and the trustees, as recommended by the directors, does not make the corporation itself liable to pay for the services of the depositary and transfer agent customarily employed on such occasions.

Nor can such a liability be assumed by the corporation without a patent misuse of its corporate funds, which equitably belong, subject to the rights of creditors, to all its shareholders alike, and not to those for whose benefit alone the depositary acts.

Under such circumstances the depositary must look for compensation to those stockholders who enter into the agreement, or to the lien which it has upon the stock certificates held by it on deposit.

Previous annual payments for such services, made by the corporation, are mere gratuities, which cannot operate as an admission of liability and afterward be made the basis of a legal claim for subsequent services.

While a corporation has a legal interest in having its officers act wisely and efficiently, it has none in the determination of who shall be chosen as its officers at any particular annual election: in this respect the corporation is not made the guardian of its shareholders.

A voluntary courtesy moved by a previous request is a good consideration for an express promise, but is not sufficient, in the absence of benefits conferred, to raise an implied one.

The existence of a custom may serve to define what the contract is between parties who have entered into a contractual relation; but if there is no such relation the custom is immaterial.

The defendant, finding it difficult or impossible to pay dividends on its preferred stock, caused another corporation to be organized which issued its bonds and gave a mortgage securing them to a trust company as trustee, promising therein to pay the trustee for its services, and giving it, in default of such payment, a first lien on the mortgaged property. *Held* that notwithstanding a request from the defendant to perform the services, the obligation to pay for them rested on the mortgagor, so that even had the defendant expressly promised to pay therefor, the promise would have been within the statute of frauds as one to answer for the debt of another.

A vote of directors authorizing the officers of a company to lend another company, created by the former for its own uses, such sums as might be needed to finance it, does not imply authority to lay upon the loaning company an absolute obligation to pay for services rendered by a third person to the newly-created corporation.

Obligations assumed by an agent in his own name toward one who deals with him on his own credit, though in the course of dealings for the benefit of the principal, bind the agent alone.

Where an express promise to pay the debt of another would not be enforcible, unless in writing, no promise can be implied.

Argued April 20th—decided May 25th, 1909.

RESERVATION by the Superior Court in New Haven County, *George W. Wheeler, J.*, in receivership proceedings, for the advice of this court as to whether certain claims presented against the estate of the defendant and heard by a committee should be allowed or disallowed. *Superior Court advised to disallow both claims.*

*George D. Watrous,* for the Knickerbocker Trust Company and the Security Transfer and Registrar Company, claimants.

*Edward A. Harriman,* for the receivers of the National Steel and Wire Company.

BALDWIN, C. J. The defendant is a corporation, incorporated in 1902 under the general laws of Maine. Its designated corporate purposes were to manufacture iron and steel and their products, and, *inter alia,* "to engage in any other manufacturing, mining, construction or transportation business of any kind or character whatsoever, and to that end to acquire, hold, own and dispose of any and all property, assets, stocks, bonds and rights of any and every kind; . . . to acquire by purchase, subscription or otherwise, and to hold or dispose of, stocks, bonds, or any other obligations of any corporation formed for, or then or theretofore engaged in, or pursuing, any one or more of the kinds of business, purposes, objects or opera-

tions of any kind herein mentioned; or of any corporation owning or holding the stocks or the obligations of any such corporation; to hold for investment, or otherwise to use, sell or dispose of, any stock, bonds or other obligations of any such other corporation; to aid in any manner, any corporation whose stock, bonds or other obligations are held or are in any manner guaranteed by the Company, and to do any other acts or things for the preservation, protection, improvement, or enhancement of the value of any such stock, bonds or other obligations, or to do any acts or things designed for any such purpose; and, while owner of any such stock, bonds or other obligations, to exercise all the rights, powers and privileges of ownership thereof, and to exercise any and all voting power thereon; . . . to make and perform contracts of any kind and description, in connection with the business herein set out not contrary to the laws of Maine; and in carrying on its business, or for the purpose of attaining or furthering any of its objects, to do any and all other powers which a co-partnership or natural person could do and exercise, and which now or hereafter may be authorized by law."

In 1904 the board of directors unanimously resolved that "it is to the best interests of the stockholders to establish a voting trust for a period of three years from September 1, 1904, the voting trustees to be Messrs. H. E. Huntington, Ogden Mills, and Henry W. Monroe," and approved a form of a voting trust agreement, which was thereupon duly executed by a majority of the stockholders and these trustees, and, in token of its assent to act under it as a depositary and transfer agent, by the Knickerbocker Trust Company of New York City.

The agreement was expressed as being between the shareholders of the corporation, who should become parties thereto, and the three trustees. Its recitals were as follows: "Whereas, the places of residence of the said stockholders are widely separated and in many instances remote

from the State of Maine, wherein meetings of the stock-holders of said company are required to be held, as appears more fully by the places of residence set opposite the names of those who subscribe these presents, thus rendering their personal attendance at such meetings inconvenient and in many cases practically impossible; and whereas, all of the said Trustees reside, or have places of business, in the City, County and State of New York, in the United States of America, where is also located the principal place for the transaction of the business of the said Company; and whereas, said stockholders deem it to be advisable and for the best interests of all of the stockholders of the Company that the control and supervision of its business shall, for a definite period of time, be vested in trustees of large experience, who are so situated as to residence and otherwise, that they can keep in touch with its affairs and seek to maintain its business upon a firm and lasting basis; and whereas, the trustees have been selected by the stock-holders because of their large business experience, and have agreed to keep in touch with the progress and management of the affairs of the said Company during the period hereinafter named, and to use their best endeavors, and exercise the authority resulting from the control of the stock transferred to them pursuant to the terms hereof, to make effective the desires of the said stockholders as hereinbefore recited."

It then provided, as respects each shareholder who should deposit his stock certificate with the Knickerbocker Trust Company, indorsed for transfer to the three trustees, whether he should or should not sign the agreement, as follows:—

The Trust Company, provided the holders of a majority in amount of the capital stock of the National Steel and Wire Company should be so deposited (as it subsequently was), was to transfer the shares of each to the trustees, giving him a transferable "certificate of interest in" stock for the

same number of shares. The legal title was to be in them for the three years, with full voting power. Such company was to hold the original stock certificates during the term, receive all dividends upon the shares evidenced by them, and pay them over to the holders of the new certificates of interest in stock. The trustees were to use their best judgment, from time to time, to select suitable directors of the National Steel and Wire Company in the interests of all its shareholders, and were not to sell or place any charge on the shares held in their names. There was no provision made in terms for any payments by way of compensation to the trustees. It was provided that the Trust Company should receive a reasonable compensation for its services, but from whom it was to come was not stated.

This agreement soon went into effect and the services which it contemplated were performed by the Trust Company at the request of the officers and directors of the National Steel and Wire Company. For two years the latter paid the former for them $250 a year, which was a reasonable compensation. Such agreements are common, and it is customary that payments for such services should be made, not by the trustees, but by the corporation whose shares may be the subject of the trust.

The committee reported in favor of the allowance of the claim of the Trust Company for compensation at the same rate for the following two years.

It is a claim that has no merit, unless it would have been collectible from the National Steel and Wire Company, had it not been put in the hands of a receiver. Irrespective of the question of *ultra vires*, there is no ground on which such a liability could have been enforced, unless it be that of an implied promise arising from its previous request and subsequent payments, or from custom.

There would be no consideration from which to raise the promise. The voting trust, which was created at the instance of the corporation, was one to which it was no

party. That its directors voted and the trust agreement recited that its execution would be a benefit to all its shareholders, did not establish that, as a fact, against the latter. It became operative whenever a majority of their number, in amount of interest, should sign it and deposit their stock certificates. There might be a large minority who declined to enter into the arrangement. They certainly could not be bound, even equitably, by any such action of the directors. Much less could the vote and the recital bind the company, an entity distinct from its shareholders, to any legal liability.

Nor was the custom which was proved material. When parties have come into a contractual relation, the existence of a custom may serve to define what the contract is. But such a relation never existed between the Trust Company and the National Steel and Wire Company, and the custom was insufficient to create it.

The Trust Company had a lien on the stock certificates which it held on deposit. This was a charge affecting the real parties for whom its services were performed, and its execution of the agreement without insisting on the insertion of any provision as to how its compensation should be obtained, strongly indicates that it was content to rely upon this lien.

The finding in the report of the committee that the services rendered were worth $500, imports not that the National Steel and Wire Company was benefited to that amount, but that they were worth it to those for whom they were rendered, that is, to certain of its shareholders.

A voluntary courtesy moved by a previous request is a good consideration for an express promise. It is not sufficient, in the absence of benefits conferred, to raise an implied promise.

Nor could one be implied from the two payments made. There is nothing to give them any other character than that of mere gratuities. For two reasons they could found

no estoppel by operating as an admission of liability, which could afterward be insisted on as the basis of a legal claim. In the first place it does not appear that the Trust Company did or lost anything in consequence of receiving them. It simply remained in a position already assumed. In the second place, they constituted, in view of the terms of the voting trust, a patent misuse of corporate funds. They applied what equitably belonged to all the shareholders, subject to the rights of all the creditors, to pay for benefits to a part of the shareholders only.

For similar reasons an express promise by the National Steel and Wire Company to satisfy this claim would have been *ultra vires.*

The sole purpose of the voting trust was to secure the control of its affairs in the hands of three designated individuals for a term of years. A corporation has a legal interest in having its officers act wisely and efficiently; but it has no legal interest in the determination of who shall be chosen as its officers, at any particular annual election. It is not made the guardian of its shareholders in that respect. If it acquires any shares of its capital stock, it cannot vote or authorize others to vote upon them. It could not put them into a voting trust, nor can it stand behind any of its shareholders who put their shares into one, and identify itself with their interests by binding itself to assume the expenses incident to the attainment of their purpose.

The committee reported in favor of the disallowance of a further claim of the Trust Company, founded on the following facts:—

There was outstanding in 1905 both preferred stock and common stock of the National Steel and Wire Company, each to a large amount. Finding it difficult or impossible to pay dividends on the former, it caused to be organized, under the laws of Maine, a new corporation named the National Consolidated Wire and Cable Company. Among its

designated corporate purposes were to engage in any "manufacturing, mining, construction or transportation business of any kind or character whatsoever, and to that end to acquire, hold, own and dispose of any and all property, assets, stocks, bonds and rights of any and every kind; but not to engage in any business hereunder which shall require the exercise of the right of eminent domain within the State of Maine, and all subject to the limitations hereinafter set forth. To acquire, by purchase, subscription or otherwise, and to hold, sell, assign, transfer, mortgage, pledge or otherwise dispose of the shares of the capital stock of, or any bonds, securities or evidences of indebtedness created by any other corporation or corporations of this or any other state, territory or country; to aid in any manner, any corporation whose stock, bonds or other obligations are held or are in any manner guaranteed by the Company, and to do any other acts and things for the preservation, protection, improvement, or enhancement of the value of any such stock, bonds or other obligations, or to do any acts or things designed for any such purpose; and, while the owner of any such stock, bonds or other obligations, to exercise all the rights, powers and privileges of ownership thereof, and to exercise any and all voting power thereon. . . . Without in any particular limiting any of the objects and powers of the corporation, it is hereby expressly declared and provided that the corporation shall have power to issue bonds and other obligations, in payment for property purchased or acquired by it, or for any other object in or about its business; to mortgage or pledge any stocks, bonds or other obligations, or any property which may be acquired by it, to secure any bonds or other obligations by it issued or incurred; to guarantee any dividends or bonds or contracts or other obligations; to make and perform contracts of any kind and description, in connection with the business herein set out not contrary to the laws of Maine."

Its authorized capital stock amounted to $16,000,000, at par, half common and half preferred.

This corporation acquired title from the National Steel and Wire Company to shares of the preferred stock of the latter of the par value of $333,000, and after having mortgaged them with other property to the Knickerbocker Trust Company to secure an issue of its own bonds to the amount of $8,000,000, gave to the National Steel and Wire Company in exchange for them a block of these bonds of the par value of $333,000 and forty per cent of that amount in its (the mortgagor's) preferred stock.

The mortgage provided that a reasonable compensation should be paid by the mortgagor to the Trust Company as trustee thereunder, or, in default of such payment, should be a charge on the mortgaged property, and that this company should have a first lien thereon for its reasonable expenses and compensation for its services as trustee. These were to include certifying the mortgage bonds and acting as registrar of all the stock of the mortgagor. The National Steel and Wire Company requested the Knickerbocker Trust Company to perform these services, and the claim in question was for compensation for their performance at the agreed price, and was reasonable in amount.

The recommendation of the committee in reference to it should be followed. The mortgage contract made specific provision as to the compensation of the trustee. It was to be paid by the mortgagor or charged upon the mortgaged property. No promise of any kind to pay it was made by the National Steel and Wire Company, and as the obligation to pay it rested on the mortgagor, even had there been an express promise by the National Steel and Wire Company to make payment, it would have been within the statute of frauds as a promise to answer for the debt of another.

With whom the price of the services was agreed on does

not appear in the report of the committee. Prima facie it was an agreement between the parties to the mortgage. But were it made between the Trust Company and the National Steel and Wire Company, that would not justify the allowance of the claim. It would still remain a claim against one person for the recovery of a debt due from another.

That the National Consolidated Wire and Cable Company was merely a financial tool of the National Steel and Wire Company, and created by it for such a use, and that the latter requested the Trust Company to perform the services required by the terms of the mortgage, cannot vary the rights of the parties to that instrument. Obligations assumed by an agent in his own name, toward one who deals with him on his own credit, though in the course of dealings for the benefit of the principal, bind the agent alone. *Usher* v. *Waddingham,* 62 Conn. 412, 427, 26 Atl. 538.

At the request of the National Steel and Wire Company, the Security Transfer and Registrar Company rendered services to the National Consolidated Wire and Cable Company, as its stock transfer agent for two years, of the value of $2,500. During this period the directors of the former company voted to authorize its officers to lend the latter company such sums as might be needed to finance it.

This grant of authority to lend did not imply authority to lay upon the National Steel and Wire Company an absolute obligation to pay for services rendered to the National Consolidated Wire and Cable Company. Nor either as to the services previously or subsequently rendered is there any escape from the defense of the statute of frauds. Each of these companies was a distinct person. Each had its own obligations. The duty to pay for the services of its transfer agent rested legally on the National Consolidated Wire and Cable Company alone. Irrespective of other considerations, even an express promise by any other per-

son to answer for it would have not been enforceable, unless in writing. It follows that no implied one can be set up to support the claim now in question.

The claimant urges that its demand can be regarded as one against the National Steel and Wire Company for its own debt. It had got up this new corporation for its own purposes. Services of this nature were undoubtedly necessary for the fulfilment of those purposes. Their performance by the claimant was requested by the National Steel and Wire Company. But all these things, for reasons already sufficiently stated in disposing of the claims of the Knickerbocker Trust Company, raised no implied promise to pay for the services, if rendered, as an original debt of the promisor.

The Superior Court is advised that each of the claims presented should be wholly disallowed. Costs in this court will be taxed in favor of the receiver.

In this opinion the other judges concurred.