John Van Voorhis, J.
Plaintiff, as a stockholder of Lisk Manufacturing Company, Limited, brings this action to set aside a voting trust agreement dated March 1, 1936, to recover in the corporation’s behalf funds expended in obtaining and carrying out the voting trust agreement, to compel the defendant Clarence C. Keehn, president of said corporation, to transfer to it 575 shares of stock of said corporation and to account for all dividends and profits received by him on said stock, and to compel the removal of the individual defendants as voting trustees on account of alleged failure to perform their duties as fiduciaries.
These questions will be considered separately.
1. The Validity of the March 1,1936 Voting Trust Agreement: Plaintiff, Ike Mannheimer, is not a party to the agreement, but it is assumed that he has standing in court to sue to set it aside since the management of the corporation and nondepositing stockholders are necessarily affected by the existence of a voting trust. (Hafer v. New York L. E. & W. R. R. Co., 19 Abb. N. C. 454; Matter of Glen Salt Co., 17 App. Div. 234, 244.) Neither are the depositing stockholders parties to the action. Defendants contend that no decision affecting the validity of the voting trust can be made unless they are before the court. Ordinarily no contract could be set aside unless all parties to it were in the action, but that can hardly apply in case of a voting trust agreement since it determines the power of the trustees to vote. It seems that the trustees’ power to vote such stock can be challenged without bringing in the beneficial owners, by the same token whereby one assuming to vote under a proxy could be restrained from doing so if the proxy were invalid without bringing in the maker. (Brown v. Pacific Mail S. S. Co., 4 Fed. Cas. 420, No. 2,025 ; 5 Fletcher’s Cyclopedia Corporations, § 2072.) In Matter of Morse (Bank of America) (247 N. Y. 290), the depositing stockholders were not made *586 parties, although some but not all intervened. The absence of the others did not keep the court from holding the agreement therein to be invalid. In this case it is unnecessary to decide the point, since the agreement is upheld, but the decision is not laid upon the ground that voting trust certificate holders have not been joined as parties to the action.
The contention may be dismissed at the outset that the provisions of this agreement are so broad as to render the instrument void in its entirety. The alleged objectionable part states that the voting trustees shall possess and be entitled to exercise all rights, of every name and nature, including the right to vote, in respect of any and all shares of stock of the company deposited pursuant to the agreement, at any and all meetings of the stockholders of the company, upon any and all propositions which may come up at any such meeting or meetings. It is contended that rights of stockholders other than the right to vote are vested in the voting trustees, which is claimed to be illegal. The only rights which the stockholders undertake to surrender (except with regard to stock dividends, which raise no problem) are such as may be exercised “at any and all meetings of the stockholders of the company, upon any and all propositions which may come up at any such meeting or meetings.” That refers only to the right to vote and to such incidental rights as may be exercised in the conduct of stockholders’ meetings. This statement disposes of most of the charges of illegality made by plaintiff in regard to the coverage of the voting trust agreement. No decision is required at this time whether power is granted to vote upon propositions other than the election of directors, such as the dissolution of the corporation, which is mentioned by plaintiff. The implied limitation withholding from voting trustees power to vote for dissolution contained in the agreement in Matter of Bacon (Susquehanna Silk Mills) (287 N. Y. 1) is not present here. Such power probably would not be conferred by general words even in the absence of such a limitation, but that cannot be decided unless an attempt is made by the voting trustees to exercise the power. The Court of Appeals assumed that power to vote for dissolution could be granted, saying (p. 6): “ The power to destroy stock would not, however, be implied merely from a power to vote the stock. Only by the use of clear language can such an extraordinary power be conferred.” A voting trust agreement capable of a construction which will make it valid will not be adjudged illegal. (Manson v. Curtis, 223 N. Y. 313, 324.) Even if this agreement were held to confer some powers forbidden by law that would not invalidate it *587 entirely. Only the powers prohibited would be deemed to be withheld. Such an infirmity would not go to the heart of the voting trust, as was the case in Matter of Morse (supra).
This agreement is also claimed to be illegal in that it does not have a specifically designated purpose. This objection reverts to the older case law that voting power can be transferred irrevocably to carry out a particular policy previously arrived at but not to enable voting trustees to exercise their discretion in formulating corporate policy to be pursued. (White v. Thomas Inflatable Tire Co., 52 N. J. Eq. 178.) In Cone v. Russell (48 N. J. Eq. 208, 215) Vice-Chancellor Pitney denounced certain types of agreement, stating: “ This conclusion does not reach so far as to necessarily forbid all pooling or combining of stock where the object is to carry out a particular policy with a view to promote the best interests of all the stockholders; the propriety of the object validates the means and must affirmatively appear.” (See Kreissl v. Distilling Co. of America, 61 N. J. Eq. 5, 13.) The latitude inherent in the application of such a rule has tended to be exercised so as to broaden the scope of the particular policy conditioning the validity of the voting trust. In an article in Columbia Law Review (vol. 18, pp. 123, 136 [1918]) I. Maurice Wormser stated: “ The correct rule to adopt is to uphold the legality of the voting trust or pooling agreement, provided the propriety of reasonableness of its object affirmatively appear, and provided that the arrangement itself is honest and equitable.” But he expressly excepted New York and other States where the subject is controlled by statute. In New York “ No voting trust not within the terms of the statute [Stock Corporation Law, § 50] is legal and any such trust, so long as its purpose is legitimate, coming within its terms is legal. The test of validity is the rule of the statute. When the field was entered by the Legislature it was fully occupied and no place was left for other voting trusts.” (Matter of Morse, 247 N. Y. 290, 298, supra.) Our statute does not provide that the object or reasonableness of the voting trust shall affirmatively appear, that voting trustees cannot use their discretion in formulating policy, or that the propriety of the particular object to be accomplished alone validates the means adopted for carrying it into effect. All of these fertile grounds for litigation are eliminated. In Matter of Bacon (Susquehanna Silk Mills) (supra, p. 8) although the voting trust agreement by itself was considered too narrow to confer power to vote for a dissolution of the corporation, the court ruled, in view of a meeting of voting trust certificate holders called to instruct the voting *588 trustees in regard to a proposition for dissolution, that, ‘ ‘ Even where no affirmative vote was cast by the holder of a voting trust certificate, but no objection made, the voting trustees might properly assume that the stockholder authorized them to vote his stock in accordance with their own discretion. There would be a duty to speak where the stockholder was apprised by the voting trustees that the voting trustees would assume from silence that the depositing stockholders agreed with their construction that the voting trust agreement conferred upon the trustees authority to vote the deposited stock.” If depositing stockholders can authorize voting trustees to exercise their discretion upon so important a proposition as the dissolution of a corporation, it is obvious that the public policy of New York as declared by the Legislature and interpreted by the courts does not recognize the rule that voting trust agreements are void except where made to carry out some definite policy previously arrived at, or that the particular object must affirmatively appear so that its propriety may validate the means adopted for its execution. (White v. Thomas Inflatable Tire Co., supra; Kreissl v. Distilling Co. of America, supra; 5 Fletcher’s Cyclopedia Corporations, § 2081; Wormser, supra.) In this State voting trust agreements are not presumed to be void until the contrary appears; they are valid and binding if they do not contravene any express charter or statutory provision or contemplate some fraud, oppression or wrong against other stockholders or creditors. (Manson v. Curtis, 223 N. Y. 313, 320, supra.) If the agreement does not violate the statute or a charter provision, or on its face aim at something inequitable, it is prima facie valid; there is no presumption that it will operate oppressively in favor of dominant stockholders or that it contemplates fraud or other wrong, and before the trustees or depositing stockholders can be called upon affirmatively to show that they have taken no advantage of a fiduciary position under the doctrine of Sage v. Culver (147 N. Y. 241) facts must appear in addition to the mere existence of a voting trust agreement to show that they have placed themselves in relationships to the corporation or other stockholders which ordinarily produce a conflict between self-interest and integrity.
That brings us to a consideration of the principal ground on account of which plaintiff contends that this voting trust agreement is void, which is that it expresses and was designed to effectuate a purpose in contravention of the statute. It is said that its object was to extend a previous voting trust for a combined period exceeding 10 years. The earlier agreement was entered into March 1,1926, and expired at the end of February, *589 1936, which is the date when the term of the present agreement commenced. This objection by plaintiff does not impugn the 1936 agreement insofar as it applies to shares of stock which were not deposited under the former voting trust agreement. Owners of such shares could not be construed as contracting to forego their voting rights for longer than the duration of the latter agreement. Neither is plaintiff’s contention upheld with respect to stock deposited under both agreements. Holders of voting trust certificates under the 1926 agreement were allowed to choose at the commencement of the 1936 agreement whether to become parties to it. They had the alternative to exchange their 1926 voting trust certificates for certificates of stock in the corporation and were not bound to redeposit their shares under the 1936 voting trust. There was not even a technical violation of the statute in consequence of 1926 certificate holders signing the new agreement or forwarding their securities to the depositary in February just prior to the expiration date of the 1926 trust. Signatures of stockholders (including former voting trust certificate holders) were solicited by circular letter mailed February 4, 1936, enclosing unsigned printed copies of the new agreement. These the stockholders were requested to sign and return, and most of them did so, or forwarded their certificates to the depositary, before the last of February. New voting trust certificates were issued by the depositary and sent to the depositing stockholders as soon as their stock or former voting trust certificates were received. Plaintiff’s contention is that the agreement of 1936, providing for a 10-year term, became binding a few weeks or days before the expiration of the preceding agreement, with the result that persons who were parties to both agreements were deprived of voting rights for longer than 10 years. (Parthey v. Beyer, 228 App. Div. 308.) This objection is based upon a false premise. The 1936 agreement did not become binding until March 1, 1936, which was subsequent to the expiration of the former trust. Before then any stockholder who had signed or deposited had the right to withdraw. The parties are presumed to have acted in contemplation of the statute. The recital that the agreement was entered into “ as of ” March 1,1936, in the light of the statute, was intended to mean that it would be effective upon that date. Moreover the uncontradicted statement of both Schlegel and Keehn is that the voting trustees themselves did not sign until March 1, 1936. A voting trust agreement is not effective until the voting trustees accept the trust. (Loughery v. Bright, 267 Mass. 584, 588; 5 Fletcher’s Cyclopedia Corporations, § 2077.) The circular letter of February 4, 1936, to the stockholders, would not have *590 been enough to constitute an acceptance by the voting trustees, even if it bore their signatures instead of their typewritten names. (Malday Realty Co. v. Security Trust Co. of Rochester, 162 Misc. 436 and cases cited.) The deposit of securities in exchange for voting trust certificates before March 1, 1936, does not change the result. That was done for convenience, so as to complete the details connected with the new agreement before the expiration of the old, in anticipation that the 1936 trust would take effect as planned. The depositary, although it afterwards became agent for the trustees who ratified its previous acts, could not enter into the agreement for the trustees before they had signed it, nor act for principals who had not yet come into existence. What was done in exchanging certificates in February was informal and tentative; any stockholder or former voting trust certificate holder could have demanded and been entitled to receive the return of his former certificate at any time before March 1.
The letter of February 4, 1936, to stockholders, contains no material representations which have been proven contrary to fact. It supplies no basis for setting aside the agreement on the ground of fraud or other type of misrepresentation.
2. ¡Recovery of Corporate Funds Disbursed for the Establishment and Maintenance of the Voting Trust: A resolution of the board of directors of defendant Disk Manufacturing Company, Limited, provided for the creation of the 1936 voting trust, and the expenses thereof were paid by the corporation. Although this practice is said to be common, even to the extent of corporations’ becoming parties to voting trust agreements of their own stock (which was not done in this case), no reason is apparent on account of which a corporation should pay expenses of such a trust whether or not a party to the agreement. A corporation as such has no interest in its outstanding stock and is not ordinarily concerned in transactions among others with reference thereto. That is the basis for upholding the stock purchases of Mr. Keehn, which is discussed under a separate heading. This question was presented in Massachusetts in Sagalyn v. Meekins, Packard & Wheat (290 Mass. 434, 440) where the court held: ‘1 The corporation in the case at bar was not a party to this voting trust. Its participation in such trust was not authorized by statute. The use of corporate funds for setting up a voting trust can hardly be regarded as a corporate purpose. In the circumstances here disclosed the payment was ultra vires the corporation. Clark v. National Steel & Wire Co., 82 Conn. 178. The amount thus improperly *591 paid out must be returned to the corporation. ” The following amounts appear to have been paid out of the Lisk Manufacturing Company, Ltd’s, funds when the 1936 voting trust was established:
Stock Transfer Tax........................... $955.91
Lincoln Alliance Bank and Trust Co. depositary 500.00
Printing agreement ........................... 79.25
Printing voting trust certificates................ 70.00
Ledger sheets ................................ 10.00
$1,615.16
In addition the sum of $200 has been paid annually to defendant Security Trust Company of Rochester for acting as registrar of the stock of the corporation and also for registering the voting trustees’ certificates. The contention of this defendant that it had acted as registrar of the stock of the corporation prior to 1936, and undertook the additional duty of registering the voting trust certificates as a gratuity, is not convincing. Before 1936, it was registrar under two previous voting trust agreements which are in evidence dating back to 1921, and its counsel stated that it had acted in similar capacity since the first voting trust agreement in 1909. That is a long time to render services for nothing. The only reasonable interpretation is that the $200 annually was received for acting in both capacities. It does not matter whether that was the minimum fee usual for registering stock. It may have been also the minimum fee for registering voting trust certificates. One dealing with a corporation is charged with knowledge of its powers. (7 Fletcher’s Cyclopedia Corporations, § 3555, p. 696.) The rule has no application that in disaffirming an executed ultra vires contract the corporation must first restore what it has received. This corporation received nothing, since, in its corporate capacity, it had no interest in its outstanding stock or in the creation of a voting trust. The practice may commonly go unchallenged, and legal opinions may conflict. Doubtless these trust companies were entitled to be paid from some source, which does not alter their liability to make restoration to the corporation. The argument that plaintiff must fail because he has not proven separately the respective value of services performed in acting as registrar for the stock and for the voting trust certificates should be overruled, since this defendant knew that it was rendering services pertaining to the voting trust and that it was being paid by the corporation. It is presumed to have known the *592 law that the corporation derived no benefit. Equity requires that this defendant should render an account of the moneys of the corporation which it received without right. The assets of a corporation are a trust fund for the benefit of its creditors and stockholders. Any person receiving them and knowing that they are being paid in excess of the powers of the corporation without its deriving any advantage from the transaction becomes a constructive trustee liable to account. (Tucker v. Weeks, 177 App. Div. 158; Murphy v. Whitney, 140 N. Y. 541, 547.) The judgment to be entered herein shall be interlocutory, so far as the defendant Security Trust Company of Rochester is concerned, and shall require it to account for that portion of the $200 per annum which it has received from the defendant Disk Manufacturing Company, Limited, that properly pertains to its services in registering the voting trust certificates under the 1936 trust. That will require it to assume the burden of coming forward, if the amount be not agreed upon, with proof of the comparative value of its services as registrar of the stock and of the voting trust certificates. After the accounting has been confirmed, a transfer of funds may be unnecessary, since the voting trustees will be liable to pay to the Security Trust Company whatever portion of its annual fee is held to relate to services rendered under the voting trust. Not only would such an obligation be implied, but also the voting trust agreement contains an express provision authorizing the trustees to pay expenses of the trust.
Defendant trust companies can be directed to restore to the corporation ultra vires payments which they have received and for which they are held to be liable, but they cannot be charged with funds which they did not receive, such as the cost of printing the voting trust agreement and certificates, the ledger sheets, and payment of the stock transfer tax pertaining to the issuance of the certificates. These items total $1,115.16. The individual defendants are held liable for these funds as directors of the corporation. As in the case of the trust companies, there was no intentional wrongdoing on their part. They did not receive these moneys for their personal use and doubtless acted in the belief that the expenses of the voting trust could lawfully be paid out of the treasury of the corporation. In this they were in error, and they must take the consequences. Directors are not ordinarily liable for unauthorized expenditures of a corporation unless they have participated therein or in some other manner are guilty of negligence or misconduct. (Hirsch v. Jones, 115 App. Div. 156, 166.) The evidence as to participation is not complete regarding the individual defendants. In *593 this instance, however, they were not merely directors of the corporation; they were also trustees under the voting trust which would be responsible to pay these expenses if the corporation were not. They must have known that the corporation paid since they never did so themselves as voting trustees. In any case they were required to assume the burden of explaining the transactions and showing that no advantage was taken of the corporation. (Sage v. Culver, supra; Globe Woolen Co. v. Utica Gas & Elec. Co., 224 N. Y. 483; Hine v. Lausterer, 135 Misc. 397, mod. 232 App. Div. 719, affd. 257 N. Y. 523.) It was to the advantage of depositors under the voting trust to have the expenses paid by the corporation; it was to the advantage of the corporation to have them paid by the voting trustees. The individual defendants were fiduciary representatives of both. Plaintiff was not required to show negligence or misconduct on their parts in order to enable the corporation to recover against them; it was their duty to establish the absence of facts involving liability. This they have failed to do. The indications strongly suggest that they themselves made or authorized these disbursements by the corporation for the trust.
It is contended that the three-year Statute of Limitations (Civ. Prac. Act, § 49, subd. 7, as amd. by L. 1936, ch. 558) bars tiie cause or causes of action to recover moneys so expended. Where a legal and equitable remedy exist as to the same subject matter, the latter is under the control of the same statutory bar as the former. (Keys v. Leopold, 241 N. Y. 189.) That this action is equitable in nature does not necessarily make the 10-year Statute of Limitations (Civ. Prac. Act, § 53) applicable. In the case of defendant trust companies, the corresponding cause of action at law would be for money had and received, the limitation upon which was formerly six years. This has been shortened by chapter 558 of the Laws of 1936 amending subdivision 7 of section 49 of the Civil Practice Act to three years in an action for damages for an injury to property. (Potter v. Walker, 276 N. Y. 15, 26; Dunlop’s Sons v. Spurr, 285 N. Y. 333; General Construction Law, § 25-a; Miller v. City of Oneida, 153 Misc. 438, 440, citing Miller v. Schloss, 218 N. Y. 400, 407; Jay Bee Apparel Stores v. 563-565 Main St. Realty Corp., 130 Misc. 23, 27.) The same rule of limitation is controlling as to the individual defendants who are liable for “injury to property ” which refers to any actionable act, whereby the estate of another is lessened, other than a personal injury, or breach of contract (General Construction Law, § 25-a).
*594 It does not follow that claims to recover 1936 expenditures for the voting trust are barred, since the amendment shortening the period of limitation to three years applies only to causes of action for damages to property arising after September 1, 1936 (L. 1936, ch. 558). All of the disbursements of this nature, except the annual fee of defendant Security Trust Company, were evidently paid about March 1, 1936, when the voting trust was created. Even if there were no affirmative proof that this occurred before September 1, 1936, it would not avail the defendants since the burden of establishing the defense of the Statute of Limitations is upon the party pleading it. (Beugger v. Ashley, 161 App. Div. 576.) None of these items aggregating $1,515.16 are barred. On the other hand, with the exception of the 1936 payment, defendant Security Trust Company is not required to account for annual installments of $200 which it received more than three years prior to the commencement of the action.
A demand by plaintiff upon the corporation to sue to recover these items would have been futile and is excused.
3. Other Charges of Wrongdoing by Individual Defendants: The stock purchases by Mr. Keehn, president of the corporation, are not considered under this heading. The complaint contains broad allegations charging breach of fiduciary duty with regard to other matters on the part of these defendants as voting trustees, directors or officers, which are not substantiated by evidence.
4. Stock Purchases by Clarence C. Keehn: Mr. Keehn is president and a director of Lisk Manufacturing Company, Limited, and a voting trustee under the voting trust agreements. From 1933 to 1940, inclusive, he purchased 575 shares of stock in this corporation. There is no claim that he made a personal profit by acquiring stock and reselling to the corporation, or that he used any corporate funds in purchasing it for himself. Plaintiff asserts that these shares, which he still owns, were purchased at less than their book value, and that they were such good bargains that Keehn ought to have arranged to have had the corporation buy and retire them so as to reduce its capital and increase its surplus. No charge is made in the action against Keehn by any vendor of his stock. Plaintiff concedes that ordinarily an officer or director is permitted to buy stock in his own corporation, but contends that during these years the board of directors had established a policy for the corporation of purchasing its own stock which Keehn was under a duty to put into effect, without engaging in similar activities upon his own account. Many cases are cited holding *595 that an officer or director cannot purchase for himself property which is required for the business of the corporation, and that such purchases will be adjudged to have been made in behalf of the corporation. Examples of such decisions are New York Trust Co. v. American Realty Co. (244 N. Y. 209) and Robinson v. Jewett (116 N. Y. 40). In this case there is no claim that Keehn acquired for himself any property of the corporation or which was required by the corporation for the conduct of its business. A corporation, as such, is held to have no interest in its outstanding stock or in dealings in its shares among its stockholders. (Hauben v. Morris, 255 App. Div. 35, 46; Gilbert Paper Co. v. Prankard, 204 App. Div. 83; Securities Comm. v. Chenery Corp., 318 U. S. 80; Du Pont v. Du Pont, 256 F. 129; Bisbee v. Midland Linseed Prods. Co., 19 F. 2d 24; Berle & Means, Modern Corporations and Private Property, pp. 223-226.) Plaintiff recognizes this rule but asserts that an officer is not permitted to purchase stock himself after being directed to purchase it for the corporation. (19 C. J. S., Corporations, § 796, p. 177; Restatement, Trusts, pp. 431, 437, 563.) The difficulty with this argument is that there is no resolution of the board of directors establishing such a policy or instructing Keehn or anyone else to negotiate for or to acquire stock for the corporation. Keehn stated that, in 1932, “in an informal session, the Board of Directors, after discussing the matter and conferring with the company attorney, decided to buy some stock at $10.00 a share. We took what stock we could get at that time at $10.00 a share.” The only action taken officially by the board appears in the minutes of a regular meeting on March 7, 1933, as follows: “Mr. Keehn reported that the company had, during the year, purchased and now held in its treasury 481 shares of stock of the company. The difference between the price paid for the stock and the par value made necessary an adjustment on the surplus account.” This is followed by a statement that $43,116.11 was added to surplus representing the difference between the price paid for the stock and the par value. This resolution ratifies the purchase of these shares, but does not contemplate the purchase of further stock. Referring to the 1932 discussions among the directors, Keehn testified without contradiction, “ it wasn’t meant to be the expression of a permanent policy,” and, “ the authority [to buy stock] was only for that time as I understood it.” There is no evidence that any policy was adopted regarding future stock purchases. The subject was not again considered by the directors nor more of its stock obtained by the corporation for seven years. In 1939, the corporation bought *596 43 shares, followed by 204 in 1940. In 1939, according to Keehn, ‘ ‘ the directors again discussed the matter and thought that it might be advisable to buy some around Thirteen or Fourteen Dollars a share. * * * It was brought up again, and they were of the opinion possibly we might buy some more stock. It was left in my discretion. * * * There was no formal action taken on it.” Prior to this discussion and in the years 1933-1938, inclusive, Keehn bought 446 shares of the 575 which plaintiff seeks to compel him to transfer to the corporation. As a result of this talk among the directors, the 43 shares were bought in 1939 for the corporation. No resolution is recorded authorizing or ratifying this purchase. After that and in December, 1939, Keehn bought 10 more shares for himself followed by 119 shares in January and February, 1940. This completed his 575 shares involved in this action, which were all purchased prior to the buying of any more by the corporation. The only shares acquired by the corporation during intervals between Keehn’s purchases were the 43 which have been mentioned in 1939.
Assuming, for the purposes of the action, that Keehn could not have been engaged in any transactions of his own while under mandate to buy for the corporation, such a command is not to be implied from a few disconnected purchases by this company. If the corporation had bought none, Mr. Keehn’s own shares could not have been drawn in question. The occasion for the corporation’s buying 481 shares in 1932 was the severe operating loss then incurred which undoubtedly had sent the stock down to a point which the directors thought was below its intrinsic value. The cash surplus was sufficient to have enabled the corporation to have bought more than 481 shares, and the book value was many times the market price, but the same conservatism which seems to have been responsible for the liquid condition of the corporation in those precarious years evidently motivated the directors to question the wisdom of making further investments in its own securities. The liquidation values of many of the best stocks on the market were greatly in excess of their market values during this period of the depression; nevertheless whether to buy or sell required delicate judgment, because it was a foregone conclusion that such corporations would not liquidate, yet no one could be certain how great losses would be endured before business would improve. Disk Manufacturing Company, Ltd., reported losses in 1931-1935, inclusive. The fact that the directors did not elect to buy more stock was not so obvious a blunder as to *597 convict them of being under a malign influence which restrained them from doing so in the interest of Mr. Keehn.
The strongest argument in support of plaintiff’s position that there was a conflict between the personal advantage and duty to the corporation of Mr. Keehn resides in the circumstance that he handled both his own purchases and those of the corporation. He testified that brokerage firms frequently made offers to sell stock of the Lisk Manufacturing Company, Ltd., at his office, and that he refused some of these and accepted others, either in behalf of himself or of the corporation as he thought best. He did not report to the board of directors offers that were turned down or that he accepted personally except in the latter case through the recording of the transfers which were promptly entered in the stock transfer book and stock certificate book. Doubtless Mr. Keehn’s experience as president of a successful corporation carried weight with the directors, and, in informal discussion, the matter of stock purchases was, from time to time, left largely in his hands. That is probably the way in which such matters often work out in practice. Nevertheless, the fact that the executive head of a corporation is trusted by his directors ought not to prevent him from buying stock in his own company. Stock purchases by officers and directors are ordinarily encouraged. Caustic criticisms have been levelled at corporate officials by such writers as Ripley, Arnold, Douglas and others for having too little personal stake in their enterprises. The Securities and Exchange Act of 1934 and the regulations thereunder require solicitations for proxies on listed stocks to state the number of shares owned by each person to be voted for as director. (U. S. Code, tit. 15, § 78n, S. E. C. Regulations 14 A-l, 14A Items 5 E (3), 6 C. D.) They must tread a narrow path if they are to be forbidden from buying shares in their own companies on the theory that their skill in making such purchases belongs to the corporation, and, at the same time, be held up to harsh and hostile criticism for not owning more than they do. The Securities and Exchange Act of 1934 regulates certain purchases and sales by ‘1 insiders ’ ’ of listed securities (U. S. Code, tit. 15, § 78p), such as where the securities are held for less than six months, but nothing contained therein or in the regulations is so drastic as what plaintiff proposes.
Complications present themselves where stock is closely held, and dealings on the part of officers or directors in acquiring it which appear to be inequitable should be scrutinized. In this case, there is no evidence of interest of other voting trustees or *598 directors in Mr. Keehn’s stock purchases, or that they have combined to promote his or their personal advantage at the expense of the corporation. No connections have been exposed disqualifying them from supervising the business and affairs of the corporation. They were free in these respects to exercise the functions of their office. There is no evidence that they attempted to manipulate the market or prevented the corporation from buying for the accommodation of Mr. Keehn.
No policy for the purchase and retirement of its stock could be established except by the board of directors, and, in the absence of any resolution upon the subject, to imply such a policy from a course of conduct would require the inferences from the circumstances to be clear and unequivocal. Even the purchases by the corporation of 165 shares from W. D. Summers a week after Keehn’s last transaction at an advance in price of $6 per share is explained by the preamble to the resolution of ratification adopted February 23, 1940: 1 ‘ Mr. Keehn reported the resignation on account of ill health of Mr. W. D. Summers, who for years had represented this company in New York State. He also stated that, due to his long association with the company and excellent service, the stock in the company held by Mr. Summers (165 shares) was taken over by the company at the price of $20.00 per share and placed in the treasury.” Regardless of whether the purchase from Summers was legal as in excess of the market price (it has not been disclaimed), the undisputed evidence indicates that it was made for the purpose described and not in furtherance of any general policy of the corporation to buy its own stock.
5. Removal of Defendants from their Positions Under the Voting Trust: No willful misconduct has been shown and no violation of duty sufficient to justify removal.
Formal decision and judgment may be submitted in accordance with this opinion.