146 A.2d 5 (1958)
T. Donald HEALY, T. Donald Healy and Anne M. Murphy, co-executors under the Will of Thomas M. Healy, and Katherine S. Healy, guardian ad litem for Margaret Healy, T. Donald Healy, Jr., and Donna Anne Healy, Plaintiffs,
v.
Ogden A. GEILFUSS, J. O. Shuford, Guy M. Babst, Jesse Draper, A. F. Ibby, Jr., Granger Hansell, B. Earle Yancey, Sr., and Tracy C. Weltmer, and Ogden A. Geilfuss, M. R. Clary and Granger Hansell, as Trustees under a Voting Trust Agreement executed February 23, 1956 known as the Columbia Baking Company Voting Trust Agreement, and Phoenix, Inc., a Georgia corporation, and Columbia Baking Company, a Delaware Corporation, Defendants.
Court of Chancery of Delaware, New Castle.
November 14, 1958.
*6 George T. Coulson, of Morris, Nichols, Arsht & Tunnell, Wilmington, and Milton Schilback, New York City, for plaintiffs.
Arthur G. Logan, of Logan, Marvel, Boggs & Theisen, Wilmington, for defendants other than Guy M. Babst and Tracy C. Weltmer.
MARVEL, Vice Chancellor.
Plaintiffs, who are either stockholders or representatives of stockholders of a corporation formerly known as Columbia Baking Company,[1] have brought this derivative action for the benefit of that corporation, naming as the real defendants the directors of Columbia, the trustees of a voting trust of Columbia common stock, and Phoenix, Inc., a Georgia corporation. The complaint charges that the director defendants improperly caused Columbia Baking Company to participate in the creation of a voting trust of its own stock and illegally to purchase with approximately $1,138,447 of its corporate funds certificates of such trust for the purpose of gaining and holding control of their corporation. The complaint prays for a judgment directing an accounting from the individual defendants and Phoenix not only for the profits realized by them from the transactions complained of but also for the damages thereby caused Columbia.
For a period of approximately two years prior to the consummation of the acts here complained of the affairs of Columbia were under the effective control of Tracy C. Weltmer by reason of his direct and indirect ownership of 27,767 of the 100,000 shares of Columbia common stock outstanding and his sole trusteeship of an investing trust of another 15,900 such shares. Board dissension over Weltmer's corporate policies and practices having arisen in the autumn of 1955, ways and means of having him forcibly removed as an officer and director of the Company were explored, however, on advice of counsel it was ultimately decided by the dissident members of the board that the only feasible way to effect Weltmer's removal was to buy him out. Plaintiffs would have no grievance had the Weltmer stock been purchased outright at whatever price per share the Weltmers could extract. What they complain of is the method whereby such purchase was allegedly effected by the individual defendants for the purpose of gaining control of Columbia.
At the time that negotiations for the purchase of the Weltmer stock were entered into Columbia was indebted to Citizens & Southern National Bank, a Georgia bank, in the amount of $650,000 under a loan agreement which disqualified Columbia from purchasing its own stock until such loan was paid, and as noted above, Weltmer at the time controlled Columbia. Efforts to find an independent buyer having failed, it was decided by Geilfuss and his associates to use the offered facilities of the defendant, Phoenix, to finance the proposed purchase from the Weltmers. Phoenix Inc., an investment corporation with resources of over one million dollars controlled by the Atlanta law firm of Cranshaw, Hansell, Ware and Brandon, had been brought into the picture by Granger Hansell, a partner in such firm whose services had been retained by the dissident directors, Odgen A. Geilfuss and Guy M. Babst. Inasmuch as Weltmer's control prevented the dissident directors from making formal financial commitments on Columbia's behalf Phoenix' willingness to serve as a temporary purchaser of the Weltmer stock provided a means whereby the price the Weltmers wanted could be met and steps could be taken for the ultimate discharge of the Citizens & Southern National Bank loan without formal corporate *7 authorization on the part of Columbia's board of directors. Arrangements were thereupon entered into for buying the Weltmers' stock. A price of $41 per share for such stock having been tentatively agreed upon (the odd lot market price for the stock then current being approximately $25 bid, $27 asked) Phoenix reached an understanding with Mr. Geilfuss early in January 1956 that if it should successfully complete negotiations with the Weltmers, it would sell to Columbia voting trust certificates covering all the stock to be acquired from the Weltmers (except 1,000 such shares representing Phoenix' compensation for its services) for the gross price paid for such stock by Phoenix. In return, Mr. Geilfuss in his capacity as president of Columbia agreed that Columbia would then purchase these same voting trust certificates although he qualified such commitment by stating in the memorandum of agreement concerning the transaction that he was "* * * executing this letter without the formal authority of the Board of Directors or stockholders of Columbia Baking Company on account of the fact that the Weltmers at this time control both. However, I am executing this in the belief that I am authorized to do so as the principal executive officer of Columbia (other than the Weltmers) and that I am acting for the best interest of the corporation and the other stockholders. However, if it should be determined that I have acted beyond the scope of my authority, I shall have no personal liability."
Simultaneously, Mr. Geilfuss and his confederates made arrangements with The First National Bank of Atlanta for a $1,600,000 loan to finance Columbia's proposed part in a complex arrangement which, when consummated, would result in Columbia's acquisition of a beneficial interest in substantially all the Weltmer stock. On January 16, 1956 a formal contract between the Weltmers and Phoenix was entered into and virtually consummated, most[2] of the Weltmer stock being then tendered together with the Weltmers' resignations as directors, officers and employees of Columbia. Arrangements were made for the taking over by Mr. Geilfuss and Mr. Babst of the Weltmer investing trust and Phoenix warranted that it was "purchasing said common stock from Weltmers for investment only and not for any public resale by Phoenix and that no public offering had been made or is contemplated by Phoenix such as to require registration by Weltmers with the Securities and Exchange Commission." Phoenix purported to release the Weltmers from any and all claims for their acts as stockholders, directors, officers or employees of Columbia, or as trustee or member of the investing trust, and Messrs. Geilfuss and Babst and Mrs. Babst who had consented and agreed to the contract between the Weltmers and Phoenix also agreed to give similar releases to the Weltmers. Finally, Phoenix agreed to cause a stockholders' resolution approving the acts of Columbia's directors and officers to be passed at the company's 1956 annual stockholders' meeting scheduled to take place the following month. My reading of the pleadings and the papers evidencing these transactions satisfies me that Phoenix while acting in Columbia's behalf was not an agent in the strict sense of that word, that Phoenix made an outright purchase of stock from the Weltmers, deposited such stock in a voting trust and then sold to Columbia a voting stock certificate representing substantially all such stock.
By supplemental agreement the defendant, Hansell, was named substitute management proxy in lieu of the Weltmers at the February 15, 1956 annual meeting of stockholders, a meeting at which a number of features concerning the purchase from the Weltmers including the fact that the *8 incoming Columbia board proposed to borrow $1,600,000 and acquire from Phoenix voting trust certificates representing substantially all the Weltmer stock, were not disclosed to the stockholders. The day following the stockholders' meeting the new Columbia board resolved to purchase from Phoenix a voting trust certificate representing the beneficial interest in 26,231 shares of Columbia common stock for the price paid by Phoenix for such stock, namely $1,116,471 plus interest from January 16, 1956 and to borrow $1,600,000 to finance such transaction and repay the moneys due Citizens & Southern National Bank. On February 23, 1957 Columbia borrowed the $1,600,000 and Phoenix created a voting trust of its Columbia shares (minus the 1,000 shares retained for its services) naming as trustees Mr. Hansell, Mr. Geilfuss, and Mr. Hansell's secretary, Miss Clary.
Plaintiffs contend that the record discloses that Columbia's own funds were improperly used to create and maintain an illegal voting trust of its own stock and that it is further established by the papers before me that the individual defendants in any event breached their fiduciary duty to Columbia and its stockholders by causing Columbia to assume a heavy financial responsibility for the improper purpose of securing and perpetuating their control of corporate management. Plaintiffs submit that they are accordingly entitled to an interlocutory summary judgment, and while their complaint merely seeks an accounting, plaintiffs now contend that such interlocutory judgment should rescind the purchase and sale between Phoenix and Columbia leaving the matter of the fixing of precise damages to be determined in further proceedings.
The need for effecting a change in the Weltmer management and of ensuring some stability to a succeeding management is readily apparent from the papers before me. There had been several changes in top management of Columbia in the period immediately preceding the transaction here complained of, and the Weltmers during their tenure had caused the corporation to incur a wide variety of financial obligations of doubtful value to Columbia and its stockholders. Significantly, net earnings declined approximately a third during this two-year period. It is also apparent that even if the Weltmers had chosen to negotiate directly with their own corporation, because of its agreement with the Citizens & Southern National Bank Columbia could not directly buy the Weltmer stock for itself unless new borrowing arrangements were to be made and assumed by the corporation. Moreover, as defendants contend proved to be the case with The First National Bank of Atlanta, which ultimately provided the funds for the purchase from Phoenix, any institution or person providing the financing necessary to install new management would obviously seek to secure the retention of such management at least until the repayment of the loan was assured. However, despite these understandable business factors it is not entirely clear why the individual defendants, who were and are men of considerable means, did not arrange personally to buy the Weltmer stock once it proved impossible to effect an outright sale to an independent third party. The question before me, however, is not that of the wisdom of the business decisions made by the present Columbia directors concerning the Weltmer stock but whether they committed acts which are actionable wrongs cognizable in an equitable action such as this.
First of all it is obvious that a would-be seller of a substantial block of stock such as that held by the Weltmers could reasonably expect to be paid a price per share substantially in excess of the market price. Stock which had constituted effective corporate control in the hands of the Weltmers obviously would serve the same purpose in the hands of a willing buyer. Accordingly, plaintiffs while objecting to the price paid by Columbia to Phoenix strenuously contend that regardless of the defendant directors' motives the purpose behind their actions was to gain control. On the closing *9 of the Weltmer purchase, however, the voting rights on the 15,900 shares in the investing trust were assigned to The First National Bank of Atlanta and not to one or more of the individual defendants, and on the acquisition by Columbia of voting trust certificates for the 26,231 additional shares of its own stock, such shares became automatically disenfranchised. Defendants contend that these sequels of the transaction complained of and others such as a cutting down of corporate salaries and directors' fees, the abolishing of the office of chairman of the board, a reduction in legal expenses, and the resignation of Mr. Babst from the position of vice president (a position not later filled) are all inconsistent with any plan or conspiracy to seize and retain control of Columbia. Finally, defendants submit that inasmuch as there is no showing that the acts complained of were ultra vires in the sense of being illegal, any irregularities or improprieties latent in this rather unusual corporate transaction were effectively ratified by the stockholders after a full disclosure made to them prior to an adjourned annual meeting held on March 25, 1957. Plaintiffs insist, however, that the acts complained of are technically ultra vires as well as violative of the fiduciary duty of the individual defendants and that the transaction complained of could not be ratified and must be formally rescinded.
It is first argued that the present record establishes the fact that "the expenses and financing" for the creation of Columbia were completely borne by Columbia and that accordingly the transaction was illegal and ultra vires, Sagalyn v. Meekins, Packard & Wheat, 290 Mass. 434, 195 N.E. 769, Clark v. National Steel & Wire Co., 82 Conn. 178, 72 A. 930, Mannheimer v. Keehn, Sup., 41 N.Y.S.2d 542, and 5 Fletcher, Cyclopedia, Corporations (Perm. Ed.) § 2088. These authorities hold that directors may be held personally accountable when corporate funds are spent to set up a voting trust, however, an affidavit of E. J. Bently, the secretary of Columbia, states that "* * * Columbia did not pay the legal expenses incidental to the creation of the voting trust, and incurred no substantial costs or expenses of any sort incidental thereto * * *." He does not, however, indicate the exact extent or nature of such costs and expenses, although it appears that transfer stamps required in the transaction were paid for by Columbia. Plaintiffs go on to contend that the application of corporate funds to the purchase of the voting trust certificate from Phoenix falls within the rule stated in the cited cases making no distinction between the actual expenses of the creation of the trust and the purchase by Columbia of the voting trust certificate. Plaintiffs also argue, and defendants agree, that the acquisition by Columbia of the beneficial interest in its own stock emasculated the purpose of § 218 of Title 8 Del.C. for the reason that while stockholders may create a voting trust (provided the terms of the statute are met) a corporation may not "own" its own stock. However, plaintiffs do not make it clear how the precise terms of the Delaware voting trust statute were violated by Columbia's purchase of the voting trust certificate, and had Columbia made the stock purchase from the Weltmers, which it could have done provided its capital was not thereby impaired (§ 160, Title 8, Del.C.) the same result would have been reached.
Next seizing on defendants' contention that the voting trust qualifies as an open end trust (allegedly permitting withdrawal of its shares by Columbia had it so desired) plaintiffs charge and defendants admit to a possible violation of federal law in failing to file a registration statement with the Securities Exchange Commission, but assuming such to be the case no violation of the Delaware Corporation Law is found in such alleged statutory failure. Finally, plaintiffs contend that inasmuch as Columbia's charter does not specifically list voting trust certificates among the type of securities and evidences of indebtedness of itself and other corporations *10 which it may own while on the other hand the charter clause having to do with the providing of aid to any corporation by Columbia specifically includes stock voting trust certificates among those types of property held by Columbia which qualify the issuing corporation for aid, the rule of expressio unius requires a holding that Columbia may not hold a voting trust certificate of its own stock. It is then argued in the alternative that in the event the holding by Columbia of a voting trust certificate for its own stock should not be held to be illegal per se, the price originally paid for the certificate was excessive, that the nominal price fixed on a later resale to Phoenix of Columbia's interest in a part of the stock involved for the purpose of meeting a loan payment of $300,000 injured Columbia, and it is further charged that Phoenix in other respects made profits at other stages of the transaction under attack at Columbia's expense.
All of these contentions, however, while pertinent to the issue of damages suffered by Columbia do not entitle plaintiffs to a summary judgment rescinding the terminated trust. Plaintiffs along with other stockholders have received and retained dividends in the form of voting trust certificates prior to the termination of the trust and in the form of common stock formerly held in the trust following such termination. In addition, after full notice to stockholders ratification of the acts of the directors here complained of was given on March 25, 1957. Such ratification cures any voidable board action, being effective except where the action of the directors constitutes a gift of corporate assets to themselves or is ultra vires, illegal or fraudulent, Kerbs v. California Eastern Airways, Inc., 33 Del.Ch. 69, 90 A.2d 652, 34 A.L.R.2d 839, Keenan v. Eshleman, 23 Del.Ch. 234, 2 A.2d 904, 120 A.L.R. 227 and Rogers v. Hill, 289 U.S. 582, 53 S.Ct. 731, 77 L.Ed. 1385. Illegal corporate acts and ultra vires acts are not necessarily synonymous, and Courts are hesitant to set aside a fully performed contract solely on the grounds of absence of express corporate power, Fletcher Cyclopedia, Corporations Vol. 7 Chap. 40, particularly §§ 3400 and 3497. Furthermore, in the case of Bay Newfoundland Co. v. Wilson & Co., 24 Del.Ch. 30, 4 A.2d 668, it was held that when ultra vires acts of a corporation are of such a nature that they can be ratified, a dissenting stockholder with notice may not stand by in order to determine whether the alleged improper acts would be to his ultimate advantage or disadvantage particularly when the rights of others are in any way injuriously affected by such delay. Finally, the facts as to the reasonableness of corporate expenditures and the relation of such expenditures to defendants' purpose are clouded in some doubt.
Were plaintiffs now seeking to enjoin the voting of the stock represented by the original voting trust certificate or the proposed distribution by Columbia of voting trust certificates or of the stock represented by such certificates to its own stockholders (a plan which the plaintiffs, T. Donald Healy, knew of as long ago as October, 1956)[3] the Court would have squarely presented for determination a question of voting rights and corporate control as they relate to the merits of this derivative action, but injunctive relief was not sought when the various acts complained of were imminent, sequestration not being the equivalent of an injunction. In the meantime the rights of third parties *11 who have received and retained beneficial interests in the old Weltmer stock have accrued, and the control complained of has been divided among the stockholders of Columbia.
Plaintiffs are, of course, entitled to go to trial on the issue of the individual defendants' accountability for the manner in which corporate funds were expended and to recover from Phoenix any moneys improperly paid to that corporation. At such trial it may perhaps be established that the transaction complained of is permeated with fraud or otherwise not subject to ratification but the relief now sought by plaintiffs may not be granted summarily on the present record. Plaintiffs' motion for interlocutory summary judgment which has been presented on the theory that there is no substantial controversy as to the alleged right to rescission is denied.
Order on notice.
NOTES
[1] Now incorporated under the name Southern Bakeries Company.
[2] On that date Phoenix received 27,231 shares of Columbia for which it paid $1,116,471. The remaining 536 shares for which it paid $21,976 were received in May, 1956.
[3] Columbia originally proposed to sell voting trust certificates to the public at a price of $25 per share. On October 2, 1956 such sale was restrained by the Securities Exchange Commission and the plan was later dropped in favor of the plan of distribution to its own stockholders. Ultimately, however, the Securities and Exchange Commission found on March 22, 1957 that while the original registration statement was deficient, "* * * the record here is barren of any evidence of fraudulent intent."