Frank S. WATTS, et al., Plaintiffs,

v.

DES MOINES REGISTER AND
TRIBUNE, et al., Defendants.

Minneapolis Star & Tribune Co.,
Intervenor Defendant.

Civ. No. 78–400–1.

United States District Court,
S. D. Iowa, C. D.

Nov. 17, 1981.

Robert B. Scism, Scalise, Scism, Gentry, Brick & Brick, John D. Hudson, Des Moines, Iowa, for plaintiffs.

James Rayhill and Robert M. Riggs, Carter, Ledyard & Milburn, New York City, Glenn L. Smith and Robert Riley, Des Moines, Iowa, for defendant Directors.

James E. Cooney and Richard G. Santi, Des Moines, Iowa, for corporation defendant.

Gary G. Gerlach, Michael Guidicessi and Barbara M. Mack, J. Michael Downey, Des Moines, Iowa, William R. Busch Jr. and Duane W. Krohnke, Minneapolis, Minn., and Thomas D. Hanson, Des Moines, Iowa, for intervenor-defendant.

## RULING AND ORDER

STUART, Chief Judge.

This matter is before the Court pursuant to the following motions filed by plaintiffs, the individual defendants and the corporate defendant, all of which came on for hearing before the Court on June 11, 1981: (1) Motion for summary judgment on Counts 5, 6, 7, and 8 of the amended complaint, filed by the defendant Register and Tribune Co. (R & T) on March 2, 1981; (2) motion for summary judgment as to Counts 1 through 8 of the amended complaint, filed by the individual defendants on March 16, 1981; (3) R & T's March 24, 1981 motion for summary judgment on Counts 1 through 4, adopting the March 16, 1981 motion of the individual defendants; (4) plaintiffs' cross-motion for summary judgment on Count 4 and (5) plaintiff's motion for certification of question of law to the Iowa Supreme Court, both of which were filed April 10, 1981; (6) plaintiffs' motion for reconsideration of Magistrate Longstaff's Pretrial Order limiting discovery into the bases for the decision of the R & T's Special Litigation Committee (SLC), filed on May 1, 1981; and (7) plaintiffs' May 15, 1981 motion to strike the report of the R & T Special Litigation Committee.

Since the date of hearing, on July 13, 1981, plaintiffs moved for summary judgment in their favor on Count 5 of the complaint. The Court will consider said motion in connection with the motions for summary judgment filed by the corporate and director defendants, respectively.

After careful consideration of the pertinent portions of the record, briefs and affidavits filed in this matter, together with the oral arguments of counsel, and being otherwise fully advised in the premises, the Court enters the following Ruling and Order.

## BACKGROUND

This is an action originally initiated on December 7, 1978 by minority shareholders of the R & T against the company and its directors, alleging a breach of fiduciary duties and violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq., Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5 and the Iowa Uniform Securities Act.

Four additional derivative counts were added pursuant to an amended complaint filed January 17, 1979, wherein plaintiffs alleged that the terms of a voting trust established in August of 1978 violated Iowa law, that corporate expenses incurred in connection with the trust were improper and that the defendant directors acted to the detriment of the corporation in approving the R & T's purchase of the McCoy Broadcasting Company (McCoy) and its sale of shares of Cowles Communications, Inc. (CCI) to Gardner Cowles, Jr. An eighth count challenging the administration of the

R & T's stock purchase plan was subsequently added.

On June 4, 1980, the R & T's board of directors adopted a resolution delegating to a special litigation committee the authority to conduct a comprehensive review of the substance of the plaintiffs' derivative claims and to determine whether pursuit of such claims was in the best interests of the corporation. Two disinterested directors, John Chrystal and Burke Marshall, were thereafter appointed to the committee. Independent counsel, Professor Marvin Chirelstein and Ms. Julia Mears, were retained to examine and analyze pertinent documents and to render advisory opinions regarding the factual and legal merit of the derivative causes of action, set forth in Counts 4 through 8 of the amended complaint.

After extensive investigation, the committee issued its report on February 19, 1981. Having concluded that the interests of the corporation would be best effectuated through dismissal of Counts 5 through 8, the committee directed corporate counsel to move for summary judgment on such counts. As to Count 4, however, the committee determined that the R & T would benefit from an adjudication of the validity of the voting trust, and thus required corporate counsel to oppose plaintiffs' request for a judicial declaration of the trust's illegality.

The counts will be discussed in the order presented in the complaint. As every count has been challenged by a motion for summary judgment, it is appropriate to set out the standards which will guide the Court's determination of that issue at this point.

■ Under Federal Rule of Civil Procedure 56(c), a motion for summary judgment should be granted only when the pleadings, discovery and affidavits on file show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. This is a drastic remedy and the movant bears the heavy burden of establishing his right to judgment with such clarity as to leave no room for controversy and of proving that the non-moving party could not recover under any discernable circumstances. *Vette Co. v. Aetna Casualty & Surety Co.*, 612 F.2d 1076, 1077 (8th Cir. 1980). The evidence must be viewed in the light most favorable to the non-movant, who is entitled to the benefit of all reasonable inferences to be drawn from the facts. *McLain v. Meier*, 612 F.2d 349, 356 (8th Cir. 1979). However, when appropriate, summary judgment fulfills the salutory purpose of avoiding useless and time consuming trials. *Butler v. M.F.A. Life Insurance Co.*, 591 F.2d 448, 451 (8th Cir. 1979).

## FACTS

In summarizing the facts and circumstances surrounding the challenged trust transaction about which there is no genuine issue, the Court has relied heavily upon the factual exposition developed by Professor Chirelstein in his report of September, 1980.

Since 1903, when Gardner Cowles first acquired a majority interest in the R & T, the Cowles family has controlled more than half of the outstanding shares of this closely held corporation, either directly or in trust. In recent years, R & T management became concerned that dispersion of stock owned by Cowles family members would render the company vulnerable to acquisition by one of the national newspaper chains. Because approximately 25% of R & T shares were held in irrevocable trusts, management also feared that any family members who controlled the devolution of these shares in the capacity of trustee would be obligated as fiduciaries to accept a remunerative takeover offer.

Professor A. James Casner and the New York law firm of Carter, Ledyard and Milburn were thus retained in 1977 to examine various corporate control mechanisms and to select that mechanism which would best perpetuate Cowles dominance of R & T policies and operations, in order to preserve the "continuity, stability and independence of the management and policies of the Company so that the traditions of independence and journalistic excellence which mark the Company's newspapers may be continued

and advanced." Private Placement Memorandum, August 22, 1978 (Defendants' Exhibit 36 at page 12). However, the record is devoid of any evidence that the R & T was threatened by hostile takeover attempts at any point during the relevant period.

Several procedures devised by special counsel were discussed with R & T management at a series of town meetings convened during 1978. Responsibility for payment of all expenses incurred in the compilation and presentation of Professor Casner's study was assumed by the corporation. Ultimately, a combined voting trust and recapitalization plan was settled upon as the mechanism best calculated to preserve the Cowles tradition of journalistic independence and integrity. Participation in the trust would be limited to a small group of family members and other large shareholders. Under the recapitalization plan, stockholders were required to exchange eight shares of existing stock for one voting and seven nonvoting shares, with no change in equity interests. The newly converted voting shares were then to be deposited by participating shareholders in the trust for a renewable term of ten years, and voting trust certificates were to be issued in exchange therefor. Also contemplated under the terms of the trust agreement was the free alienation by participating shareholders of their beneficial interests without a concomitant transfer of voting power from the five trustees designated in the agreement.

Once management decided to implement the voting trust, counsel prepared a private placement memorandum and related documents designed to ensure compliance with the private offering exemption of the Securities and Exchange Act of 1934. These materials were issued only to the small group of shareholders who were invited to deposit voting shares in the trust. Following formal board approval of the transaction in August of 1978, certain of the aforementioned shareholders and the five designated trustees executed the voting trust agreement on August 22, 1978. Fifty-seven shareholders, who together owned approximately 60% of eligible shares, had by December 7, 1978 agreed to place their voting shares in the trust.

On November 1, 1978, the R & T board of directors adopted the recapitalization plan and scheduled a special shareholders' meeting at which shareholder approval of the plan would be solicited. Information regarding the trust and plan of recapitalization was thereafter disseminated to all shareholders. Before these materials were mailed to shareholders, however, they were submitted in draft form to the Iowa Superintendent of Securities, accompanied by a request that the Superintendent either confirm that the plan of recapitalization did not constitute a sale of securities necessitating registration under the Iowa Uniform Securities Act, or, should it be determined that a sale was indeed involved, that it was exempt from registration under Section 502.203, subd. 13 of the Act. After reviewing the materials submitted by the R & T, the Superintendent's Office advised the company in writing that it would take no enforcement action in the event the recapitalization were effectuated without registration in reliance upon the statutory exemption, provided that full disclosure was made to all shareholders.

At the meeting held December 7, 1978, the plan of recapitalization was approved by 84% of shares outstanding and eligible to vote. The voting trust ultimately became effective on January 22, 1979.

## COUNT ONE

Count 1 of the complaint alleges that the R & T directors breached their fiduciary duties to the corporation by establishing a voting trust and approving a plan of recapitalization. Specifically, plaintiffs contend that certain mailings pertaining to the foregoing transactions were sent only to members of the Cowles family who held relatively large blocks of stock, and that the directors thereby conspired to misrepresent to or conceal from plaintiffs and other shareholders similarly situated the purposes, provisions and effects of the recapitalization plan and the voting trust agreement "in breach of their fiduciary duties to share-

holders and in obeisance to their personal interests". Plaintiffs in their prayer seek injunctive and other equitable relief. In this connection, the Court denied a preliminary injunction on January 22, 1979.

Plaintiffs maintain that the sole purpose underlying R & T participation in the voting trust was the perpetuation of Cowles family control of the corporation, in order to protect the personal interests of the present management. Conversely, defendants claim that the directors of the R & T firmly believe that corporate independence and local control are essential to the preservation of the quality and integrity of the newspapers established by Gardner Cowles, and are thus concerned with continuing management policies in the Cowles tradition.

Defendants first argue that "even assuming the facts are as presented by plaintiffs, the Directors' purpose is valid and no genuine issue as to a material fact is presented." In support thereof defendants cite *Herald v. Seawell*, 472 F.2d 1081 (10th Cir. 1972); *Panter v. Marshall Field & Co.*, 486 F.Supp. 1168 (N.D.Ill.1980), aff'd, 646 F.2d 271 (7th Cir. 1981). Having reviewed these authorities, the Court finds them distinguishable on the following grounds.

First, these cases were not before the Court on a motion for summary judgment. In *Seawell*, the Tenth Circuit determined that the evidence did not sustain certain specific findings of the trial court. In *Panter*, the trial court directed a verdict on all claims because the evidence offered by plaintiffs together with all reasonable inferences favorable to them which could be derived therefrom failed to prove the necessary elements of their case. The Seventh Circuit agreed, but pointed out the difference between a directed verdict and a motion for summary judgment, stating:

> Thus to survive summary judgment a party need only *raise* an issue of fact, whereas the test on a directed verdict is whether a party has presented sufficient evidence to support a finding in his favor on that contested issue. The directed verdict situation presents a higher evi-

dentiary hurdle than the preliminary test of the summary judgment.

*Panter v. Marshall Field & Co.*, 646 F.2d at 282.

Secondly, the cited cases do not support the proposition that the challenged directorial purpose is a valid one. The Tenth Circuit in *Seawell* observed:

> The facts show appellants' motive for implementing the Employees Stock Trust was to benefit the public, the corporation and the employees. Any contrary finding under the law and the evidence is clearly erroneous.

*Herald v. Seawell*, 472 F.2d at 1095. Under the *Seawell* court's view of the evidence presented in the case, there was no proof that the ultimate purpose of the directors was to perpetuate their control of the post. Id. at 1097.

In considering a state law claim for breach of fiduciary duty, the trial court in *Panter* quoted the following provision of Delaware law, " '[s]hares may not be issued solely to preserve or to gain corporate control' and 'corporate action, though technically correct and in compliance with Delaware Corporation Law may not be undertaken for an inequitable purpose'." *Panter v. Marshall Field & Co.*, 486 F.Supp. at 1193. While recognizing that corporate directors have the right and duty to oppose takeover offers that they have, in good faith, determined would be detrimental to the corporation, the trial court did not espouse the principle that it is proper for the directors to take corporate action to retain particular individuals as officers or directors. Instead, a verdict was directed for defendants because the evidence presented was not sufficient to show that the directors acted solely to preserve their positions as directors of the company.

Neither case supports defendants' argument that the sole ultimate purpose of maintaining control in incumbent management is a valid corporate action.

█ The Court agrees that management, fearful of a takeover attempt, need not wait until such an attempt is imminent to

employ proper defensive tactics. Hochman & Folgers, "Deflecting Takeovers: Charter and By-Law Techniques" 34 Bus.Law 537 (1979). However, the presence or absence of a threat of hostile takeover may have some relevance as to the directors' motives in taking certain measures.

■ The accomplishment of some definite plan or policy to benefit the company, to assure stability and continuity of management for this purpose and to prevent rival concerns or competitors from gaining control are legitimate bases for implementation of a voting trust. 5 Fletcher, Cyclopedia of the Law of Private Corporations, § 2081 at 359 (rev'd perm. ed. 1976). If, however, "the only object or purpose of a voting trust is to corner the majority stockholders' right to vote in an arrangement from which they cannot escape and to secure permanency of management and office holding for a scheming group, this would seem clearly contrary to the policy of the law." 5 Fletcher, Cyc.Corp., § 2802 at 362. Contra, *Perry v. Missouri-Kansas Pipe Line Co.*, 22 Del.Ch. 33, 191 A. 823 (1937).

To examine the issue of directorial intent in the context of a motion for summary judgment would compel the Court to engage in a comprehensive review of all matters contained in the record. Bearing in mind the Eighth Circuit's stringent standard for granting such a motion, the Court believes that plenary consideration of the matter of defendants' motivation at this stage in the proceeding could well result in a denial of the motion followed by a full trial. Moreover, subjective issues of intent are not readily susceptible to summary disposition on the basis of a documentary presentation. See *Crouse-Hinds Co. v. Internorth, Inc.*, 634 F.2d 690, 704 (2d Cir. 1980); *Gall v. Exxon Corp.*, 418 F.Supp. 508, 520 (S.D.N.Y.1976); Dent, The Power of Directors to Terminate Shareholder Litigation, 75 N.W.U.L.Rev. 96, 101 n. 28 (1980).

■ Thus in order to further the goals of judicial efficiency and economy and to eliminate the possibility of a reversal in the event defendants' motion were sustained, the Court has determined that the motions for summary judgment with respect to Count 1 should be submitted along with the case on its merits. Whether or not plaintiffs can successfully surmount "the higher evidentiary hurdle" of a motion for directed verdict is a matter of speculation at this juncture; but the Court is satisfied that judicial efficiency and fairness favor allowing plaintiffs a full evidentiary hearing on the substance of claims asserted in Count 1.

## COUNTS TWO AND THREE

Both the individual and corporate defendants move for summary judgment as to Counts 2 and 3 of the amended complaint, wherein plaintiffs rely upon Section 10(b) of the 1934 Securities and Exchange Act and Rule 10b–5 promulgated thereunder, as well as the parallel provision of the Iowa Uniform Securities Act, Section 502.401, in challenging various misrepresentations and omissions purportedly contained in materials issued to R & T stockholders in connection with the implementation of the voting trust and recapitalization plan. Defendants in their respective motions maintain that no purchase and sale of securities within the terms of the applicable statutes was effected through the transactions complained of, and that plaintiffs in any event were not purchasers or sellers of voting trust certificates. Since the Court is satisfied that the first issue is dispositive of the securities claims asserted in Counts 2 and 3, it need not address defendants' remaining arguments.

■ Because Section 502.401 of the Iowa Code, "almost directly mirrors federal rule Rule 10b–5", *Dirksen v. Hynes & Howes Ins. Counselors, Inc.*, 423 F.Supp. 1290, 1292 n. 3 (S.D.Ia.1976), the Court's analysis of plaintiffs' federal securities claims is equally applicable to those premised on the Iowa blue sky law. Section 10(b) and Rule 10b–5 expressly prohibit the use of manipulative, deceptive or misleading practices in the context of the purchase or sale of any security. Some transfer of ownership, whether in the form of a surrender of control, change in ownership

or alteration of the fundamental nature of an investment must therefore be shown in order to comply with the purchase or sale element of proof. *Sacks v. Reynolds Securities, Inc.*, 593 F.2d 1234, 1240 (D.C.Cir. 1978); *Abrahamson v. Fleschner*, 568 F.2d 862, 868 (2d Cir.), cert. den., 436 U.S. 905, 98 S.Ct. 2236, 56 L.Ed.2d 403 (1978). In addition, only a defrauded purchaser or seller of securities is endowed with the requisite standing to sue under Section 10(b) and its implementing rule, 10b–5. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) (adopting rigid rule of standing devised by the Second Circuit in *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir.), cert. den., 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952)). See *Vervaecke v. Chiles, Heider and Co., Inc.*, 578 F.2d 713, 719 (8th Cir. 1978).

■ As a preliminary matter, the Court will determine whether the implementation of either the voting trust or recapitalization plan may be deemed a "purchase" or "sale" under Section 10(b) and Rule 10b–5. In examining each of these transactions, the Court will employ the "economic reality" test outlined in *McCloskey v. McCloskey*, 450 F.Supp. 991 (E.D.Pa.1978). Under the *McCloskey* rationale, the Court must focus initially upon the "economic reality of the transaction," and thereafter make "a further determination as to whether in reality the transaction constitutes a 'transformation of a securityholder's investment from an interest in a going enterprise into a right solely to receive payment in exchange for such interest' ". *Id.* at 995 (citation omitted). The Court in applying this test must keep in mind that a purchase or sale must be defined broadly in order to fulfill the purposes of the 1934 Act, *Superintendent of Insurance v. Banker's Life and Casualty Co.*, 404 U.S. 6, 12, 92 S.Ct. 165, 168, 30 L.Ed.2d 128 (1971), and may in some cases encompass transactions that bear little resemblance to conventional purchases and sales. See *Sacks v. Reynolds Securities, Inc.*, 593 F.2d at 1240.

■ Considering first the institution of the voting trust, the Court is of the opinion that the exchange of voting shares for certificates provided for in the trust agreement cannot be construed as an offering of securities within the meaning of federal and state antifraud provisions. Among the critical factors influencing the Court's determination are the following indicia of retained shareholder ownership of such shares: (1) no change in shareholder beneficial interests in the stock, including rights to transfer such interests and to receipt of cash or any other dividends, payments or distributions; (2) rights to delivery of new or additional voting trust certificates representing securities received by trustees as a dividend or other distribution, or in exchange for or as proceeds of or otherwise with respect to voting shares, including securities received pursuant to any merger, consolidation or other reorganization; (3) certificate holders may acquire or subscribe for new voting shares upon receipt of rights or warrants to purchase, as could any other shareholder; (4) worth of nonvoting shares to be assessed at same value as voting shares; and (5) surrender of voting power to trustees for a finite term of ten years, during which trustees are forbidden to sell, assign, pledge or otherwise alienate voting shares unless required by law. Upon expiration of such term, the voting power may either revert to the certificateholder or remain with the trustee, should the former wish to renew the trust agreement for an additional ten-year period.

Thus as the court observed in *McCloskey*, "the economic realities of the situation establish that [certificateholders] retained every right normally held by a shareholder with the exception of the right to vote, one which was only temporarily suspended". *McCloskey v. McCloskey*, 450 F.Supp. at 995. Accordingly, the creation of the voting trust did not effect that fundamental change in the nature of participants' investments which is essential to a judicial finding of a purchase or sale. *Id.* See *Sacks v. Reynolds Securities, Inc.*, 593 F.2d at 1240.

Focusing next upon the "economic reality" of the recapitalization, the Court con-

cludes that this transaction is not the type of disposition contemplated under Section 10(b) and Rule 10b–5, or their state law counterpart, Section 502.401. To the contrary, the conversion of voting to nonvoting shares in a prescribed ratio once shareholder approval was obtained reflects an "internal corporate management decision which only incidentally involved an exchange of shares." *In re Penn Central Securities Litigation,* 494 F.2d 528, 534 (3rd Cir. 1974). See *Sargent v. Genesco, Inc.,* 492 F.2d 750, 764–765 (5th Cir. 1974); *Valente v. Pepsico, Inc.,* 454 F.Supp. 1228, 1237 n. 10 (D.Del. 1978); *Schnorbach v. Fuqua,* 70 F.R.D. 424, 439 (S.D.Ga.1975).

In this case, the recapitalization plan was proposed by the board as a prerequisite to establishment of the voting trust, and was ultimately approved as such by a majority of R & T shareholders. Under the plan, each shareholder tendered eight shares of voting stock in return for seven shares of nonvoting and one share of voting stock, with no change in existing equity features. Thus the same dividend rights accrued to each shareholder both before and after the recapitalization. In addition, nonvoting shares were to be repurchased by the corporation at the same rate of exchange as voting shares.

Because of the overall reduction in the number of voting shares, there was no dilution of the proportionate voting strength of each shareholder. The minimal differences in the holdings of those who owned more than an even multiple of eight shares did not materially affect the nature of their original investments. In this connection, it is significant to note that the plan did not provide for corporate repurchase of fractional shares, which would permit a finding that holders of such shares were "sellers" pursuant to Section 10(b). *Fuqua v. Schnorbach,* 70 F.R.D. at 438.

■ Generally speaking, the reclassification of existing shares which resulted from the recapitalization is regarded as a matter of internal corporate policy under Iowa law. See Section 496A.14 of the Iowa Code. See also *In re Penn Central Securities Litiga-*

*tion,* 347 F.Supp. 1327, 1328 (E.D.Pa.1972), aff'd, 494 F.2d 528 (3rd Cir. 1974). However, in some instances an exchange of shares may be construed as a purchase or sale if such a transaction can be analogized to a merger or acquisition whereby shareholders receive stock in a "substantially different company with substantially different prospects." *In re Penn Central Securities Litigation,* 494 F.2d at 534. See *SEC v. National Securities, Inc.,* 393 U.S. 453, 464–467, 89 S.Ct. 564, 570–72, 21 L.Ed.2d 668 (1969); *Travis v. Anthes,* 473 F.2d 515, 521–523 (8th Cir. 1973); *Valente v. Pepsico, Inc.,* 454 F.Supp. at 1236–1237.

Under the circumstances of the present case, the exchange of voting for nonvoting shares did not occur in the context of a comprehensive corporate reorganization. There was no change in the essential corporate structure of the R & T which could be likened to the traditional merger. Nor was there a fundamental transformation of shareholder interests in the corporation, whether in terms of total assets represented by each share of stock or in relative voting power. Plaintiffs' argument that nonvoting shares are of inherently less value and consequently less marketable does not persuade the Court to the contrary, since a mere decrease in marketability does not convert the recapitalization into a purchase or sale. *Valente v. Pepsico, Inc.,* 454 F.Supp. at 1237 n. 10; *Fuqua v. Schnorbach,* 70 F.R.D. at 439.

In summary, neither the creation of the voting trust nor the implementation of the recapitalization scheme provoked a material change in shareholder investments or in the risk thereof sufficient to constitute a purchase or sale within the ambit of Section 10(b), Rule 10b–5 or pertinent provisions of the Iowa blue sky law. Plaintiffs having failed to raise a factual issue as to whether the alleged fraud was "in connection with the sale of any security," defendants' motions for summary judgment as to Counts 2 and 3 of the amended complaint are hereby granted.

## COUNT FOUR

After spending approximately two years studying various legal procedures by which continued control of the R & T by the Cowles family might be assured, the Board of Directors settled upon The Plan of Recapitalization and the Voting Trust Agreement involved in this lawsuit.

Count Four alleges a derivative action on behalf of R & T which focuses on the company's relationship to the voting trust agreement. Plaintiffs seek a declaratory decree under 28 U.S.C. §§ 2201 and 2202 holding that the Voting Trust is illegal, ultra vires and unenforceable because:

(1) Under Section 496A.33 of the Code of Iowa, a corporation may not become a signatory to a voting trust agreement and cannot exercise powers of amendment and appointment in connection therewith;

(2) A corporation may not buy and hold voting trust certificates issued by a trust comprised of its own shares;

(3) The agreement imposes improper financial obligations on the company in connection with the indemnification and reimbursement of Voting Trustees.

Plaintiffs, R & T and the individual defendants all seek summary judgment on this count of the complaint and agree that it is ripe for determination on their respective motions. The Court is of the opinion that the question of the legality of the provisions of the Voting Trust Agreement are properly subject to a motion for summary judgment, but will reserve consideration of related issues of the motivation of the board of directors and the propriety of the purpose underlying the establishment of the voting trust for trial upon identical issues outlined in Count 1 of the complaint.

A voting trust is created by execution of an agreement between a "group of stockholders and trustee, or by a group of identical agreements between individual stockholders and a common trustee". 5 Fletcher, Cyclopedia of the Law of Private Corporations, § 2075 (rev'd perm. ed. 1976). Pursuant to Section 496A.33 of the Iowa Code,

Any number of shareholders of a corporation may create a voting trust for the purpose of conferring upon a trustee the right to vote or otherwise represent their shares.

Section 496A.32 of the Code provides in pertinent part that treasury shares shall not be voted at any meeting or counted in determining the total number of outstanding shares at any given time.

Because the R & T is, under the voting trust agreement, accorded the same rights of repurchase and first refusal with regard to voting trust certificates as it has to purchase its own stock, Section 5.2, and because the repurchase of a certificate by the company does not require the trustees to surrender the underlying stock, the agreement by its terms would appear to authorize the trustees to vote stock in which the corporation holds an equitable interest. The Court cannot improve upon Professor Chirelstein's statement of the situation:

Article IV of the Articles of Incorporation of the Company provides that R & T may repurchase any shares issued to an employee if death or termination of employment occurs within 10 years from the date of issue, and shall have a right of first refusal with respect to all other outstanding shares .... Section 5 of the Voting Trust Agreement carries over and makes applicable to the Voting Trust Certificates the same restrictions on transfer and the same rights and obligations of repurchase as apply to the Company's shares under Article IV. The Voting Trust Agreement does *not* require the Voting Trustees *to surrender underlying* shares to the Company when Certificates are repurchased, however, and hence it is fairly inferable, and seems to be intended, that the Trustees may continue to vote such shares after a repurchase and even though the related Certificates are held by the Company at the time a vote is called for.

The latter inference appears to be confirmed by Section 1.1 of the Voting Trust Agreement, which states expressly that the term 'Certificateholder' ... shall in-

clude the Company itself. It is supported, also, by Section 14.1, which bars all Certificateholders . . . from withdrawing the shares represented by their Certificates until the termination of the Trust. These provisions indicate that the draftsmen intended that shares representing repurchased Certificates should continue to be regarded as 'outstanding' and hence votable by the Trustees.

Chirelstein Report at pages 12–13.

The defendants claim that Professor Chirelstein misconstrues the R & T's role as a certificateholder, which was merely to assist it in acquiring Voting Trust Certificates to the same extent it is authorized to acquire its shares and not to allow R & T to vote treasury stock in contravention of § 496A.32. To date, the defendants have not repurchased Voting Trust Certificates, and recognize that the shares of stock represented by any certificates purchased by the company in the future should not be voted or counted as outstanding for voting purposes.

Certain additional rights are granted certificateholders, which rights could be exercised by the company on repurchased certificates. Specifically, certificateholders are empowered under the trust agreement to vote on such matters as the removal of trustees, proposals for mergers and other structural changes and extension or early termination of the agreement.

In the Court's opinion, the Voting Trust Agreement can and should be construed as complying with applicable Iowa law rather than permitting the trustees to vote shares in which the equitable interests are held by the company. Nor were such shares intended to be considered as outstanding. The Court also believes that it was the intent of the agreement to treat the certificates repurchased by the Company in the same manner as treasury stock, thus barring the company from exercising the voting rights conferred upon certificateholders with respect to certificates it had repurchased. Of course, if the certificates are later sold to others by the company, the trustees' right to vote the shares and the purchasers' right to exercise the powers of certificateholders would be restored.

 The Court is most troubled by the authority conferred upon the Company directly by the Voting Trust Agreement. Section 10.3 of the agreement gives the board of directors of R & T the authority and duty to appoint successor voting trustees, subject to approval of the shareholders. Section 18 permits the amendment of the agreement by a ¾ vote of the certificateholders and three of the current trustees, but requires the company's consent to such amendment.

In the Court's opinion, these provisions constitute an improper intrusion of the company and its management into decisions that must be made by the shareholders and their selected trustees. Section 496A.33 does not permit shareholders to surrender this authority to the company or its board of directors. As presently drafted, the foregoing sections grant the company excessive control over the voting trust, which is a device traditionally employed by the shareholders to exert influence over the company, rather than a means whereby a corporation may obtain control over the voting rights of the shareholders. Accordingly, the Court holds that such portions of Section 10.3 and 18 of the Voting Trust Agreement are invalid under §§ 496A.32 and 496A.33 of the Iowa Code.

 Nor is the Court persuaded of the validity of Section 8.4 of the agreement, which imposes upon the company the obligations to indemnify trustees appointed by the R & T pursuant to Section 10.3 of such agreement and to reimburse the trustees for expenses incurred in this capacity. Expenditure of R & T funds to implement activities at the shareholder level, in this case, administration of the voting trust, cannot be sanctioned under Iowa law. See *Mannheimer v. Keehn*, 30 Misc.2d 584, 41 N.Y.S.2d 542, 550 (1943); *Sagalyn v. Meekins, Packard and Wheat, Inc.*, 290 Mass. 434, 195 N.E. 769, 772 (1935); 5 Fletcher, supra, § 2088 at page 376.

Defendants argue that the voting trust was created in order to further an important corporate objective, the preservation of the R & T tradition of independence and journalistic excellence allegedly fostered by current management. As the Court has previously indicated, an evaluation of defendants' motives and purposes in creating the trust shall be deferred until trial.

Assuming, however, that the trust agreement embodied a legitimate concern for continuation of the business policy espoused by the incumbent R & T board through the maintenance of that board in office, the Court is nonetheless convinced that § 496A.33 of the Code will not permit the corporation to be charged with expenses generated by a stockpooling arrangement executed by definition at the shareholder level, even though the corporation is itself a signatory thereto. *Mannheimer v. Keehn*, 30 Misc.2d 584, 41 N.Y.S.2d at 550. See *Healy v. Geilfuss*, 37 Del.Ch. 502, 146 A.2d 5, 9 (Del.Ch.1958); *Sagalyn v. Meekins, Packard and Wheat, Inc.*, 195 N.E.2d at 772; *Clark v. National Steel & Wire Co.*, 82 Conn. 178, 72 A. 930, 932 (1909). After an extensive review of pertinent authority, Professor Chirelstein similarly concluded that "[e]xpenses of this kind would almost certainly be deemed to be shareholder obligations despite the apparent benefit to the company of creating arrangements for the orderly devolution of control." Chirelstein Report at page 25.

■ Another factor prompts the Court's decision to invalidate the provisions for corporate indemnification and reimbursement delineated in Section 8.4. Shareholders who were not invited to deposit their shares in the voting trust should not be compelled to share in expenses attendant upon its administration, which result would inevitably obtain were the corporation required to bear such expenses. *Clark v. National Steel & Wire Co.*, 72 A. at 932. A corporation cannot "stand behind any of its shareholders who put their shares into [a voting trust] ... and identify itself with their interests by binding itself to assume the expenses incident to the attainment of their purpose", 5 Fletcher, supra, § 2088 at 376, to the detriment of other, nonparticipating shareholders. For the foregoing reasons, the Court is of the opinion that Section 8.4 of the Voting Trust Agreement is not a valid provision.

Section 20.2 of the Voting Trust Agreement contains the following clause relating to severability:

In case any provision of this agreement shall be held invalid or unenforceable in whole or in part ... neither the validity nor the unenforceability of the remainder of this Agreement ... shall in any way be affected.

Because of the peripheral applicability of the provisions herein declared to be invalid and unenforceable under Iowa law, the Court believes that they can be severed from the remainder of the Voting Trust Agreement without invalidating the entire agreement.

■ Accordingly, the Court hereby construes the Voting Trust Agreement to bar the Voting Trustees from voting any shares of stock held in the voting trust while the company owns the related certificates. It also construes the agreement to bar the company from exercising the rights conferred upon certificateholders with respect to any certificates it has repurchased.

In addition, the Court holds invalid the following portions of the voting trust agreement:

(1) Section 10.3;

(2) That portion of Section 18 which stipulates "provided that the Company shall consent to the amendment"; and

(3) Provisions in Section 8.4 for corporate indemnification and reimbursement of trustees.

As thus construed, and with the invalid provisions excised, the Court concludes that the voting trust agreement complies with Section 496A.33 of the Iowa Code. Ruling upon related issues bearing upon the motivation of the directors and the propriety of the purpose for institution of the voting trust shall be reserved pending trial on the merits of similar issues raised in Count 1 of the amended complaint.

## COUNTS FIVE THROUGH EIGHT

*Motion for Certification.*

Defendants have moved for summary judgment on counts 5, 6, 7, and 8 of plaintiffs' amended complaint for the reason that a special litigation committee of the Board of Directors of the R & T has recommended that pursuit of these derivative claims is not in the best interest of the corporation. According to the defendants, this determination is conclusive and these counts should be dismissed under the "business judgment rule."

The Iowa Supreme Court has not addressed the applicability of the traditional business judgment rule to recommendations of a corporate litigation committee formed for the sole purpose of determining whether pursuit of a particular derivative action would advance the interest of the corporation. The plaintiffs have moved for the certification of that question to the Supreme Court of Iowa pursuant to Chapter 684A, Code of Iowa.

 Certification of an unsettled question of state law is authorized under Section 684A.1 of the Iowa Code only where the resolution thereof is "determinative of the cause then pending". Mere doubt or uncertainty as to the proper construction of state law does not alone compel resort to certification. *Lehman Brothers v. Schein*, 416 U.S. 386, 390–391, 94 S.Ct. 1741, 1743–44, 40 L.Ed.2d 215 (1973); *Linn County v. Hiawatha*, No. C 80–15, at page 5 (N.D.Iowa, filed October 16, 1980). Moreover, where a de novo interpretation of state judicial rather than statutory law must be undertaken, the rationale for deferral to the state supreme court is considerably diminished. See Note, Abstention and Certification in Diversity Suits: Reflection of Means and Confusion of Goals, 73 Yale L.J. 850, 867 (1964).

 Whether or not to certify a particular question of state law lies in the first instance in the sound discretion of the federal certifying court. *State of Florida ex rel Shevin v. Exxon Corp.*, 526 F.2d 266, 274–275 (5th Cir. 1976). For the following reasons, the Court is convinced that resort to Iowa's certification procedure is not appropriate under the circumstances of this case:

(1) A resolution of the issue by the Iowa Supreme Court in favor of plaintiffs would not be determinative of matters raised in Counts 5 through 8.

(2) The issue plaintiffs seek to certify is one of common law rather than one of statutory construction, and there is thus less reason for certification.

(3) The state law question involved herein is not so complex or delicate as to cause the necessity for certification to outweigh the expense, delay and inconvenience which would result therefrom. See *State of Florida ex rel. Shevin v. Exxon Corp.*, 526 F.2d at 274–276. See also *Lehman Bros. v. Schein*, 416 U.S. at 394, 94 S.Ct. at 1745 (Rehnquist, J., concurring).

(4) This is a case which, if not settled, will be appealed. Because the Eighth Circuit Court of Appeals has the authority to certify the issue to the Iowa Supreme Court, the Court believes that the interests of judicial efficiency and economy would be best served, and the case placed in a better posture for final decision, if all issues asserted in this action were resolved by the trial court before obtaining a narrow ruling on one issue by the Supreme Court of Iowa.

Based on the foregoing analysis, the Court shall deny plaintiffs' motion for certification.

*Motions for Summary Judgment.*

Both the individual defendants and the R & T have moved for summary judgment in their favor on Counts Five through Eight in reliance on the applicability of the "business judgment rule" to the decision of the special litigation committee that the corporation should not litigate these counts as derivative actions. Because the motion applies to all four counts, the question as to whether the business judgment rule requires the Court to sustain the motions for summary judgment will be discussed first.

As first articulated by Mr. Justice Brandeis in *United Copper Sec. Co. v. Amalgamated Copper Co.*, 244 U.S. 261, 37 S.Ct.

509, 61 L.Ed. 1119 (1917), the business judgment rule could be employed to insulate the conclusions of management regarding corporate prosecution of a derivative suit from judicial scrutiny. According to Justice Brandeis:

> Whether or not a corporation shall seek to enforce in the courts a cause of action for damages is, like other business questions, ordinarily a matter of internal management and is left to the discretion of the directors, in the absence of instruction by vote of the stockholders. Courts interfere seldom to control such discretion *intra vires* the corporation, except where the directors are guilty of misconduct equivalent to a breach of trust, or where they stand in a dual relation which prevents an unprejudiced exercise of judgment.

*Id.* at 263–264, 37 S.Ct. at 510. Subsequent decisions reflect a virtually unanimous adoption of this principle by the courts. See, e. g., *Ashwander v. TVA*, 297 U.S. 288, 343, 56 S.Ct. 466, 481, 80 L.Ed. 688 (1935); *Ash v. IBM*, 353 F.2d 491 (3rd Cir. 1965), cert. den., 384 U.S. 927, 86 S.Ct. 1446, 16 L.Ed.2d 531 (1966); *Stadin v. Union Elec. Co.*, 309 F.2d 912, 921–922 (8th Cir. 1962), cert. den., 373 U.S. 915, 83 S.Ct. 1298, 10 L.Ed.2d 415 (1963); *Swanson v. Traer*, 249 F.2d 854, 858 (7th Cir. 1957); *Klotz v. Consolidated Edison Co.*, 386 F.Supp. 577, 581 (S.D.N.Y.1974). The current trend in corporate law favors the extension of the business judgment rule to encompass decisions formulated by an authorized board committee comprised of disinterested directors as to the advisability of asserting a cause of action possessed by the nominal corporation against some members of the board of directors for alleged wrongdoing. See *Burks v. Lasker*, 441 U.S. 471, 480, 99 S.Ct. 1831, 1838, 60 L.Ed.2d 404 (1979); *Lewis v. Anderson*, 615 F.2d 778, 782–783 (9th Cir. 1979), cert. den., 449 U.S. 869, 101 S.Ct. 206, 66 L.Ed.2d 89 (1980) (California law); *Abbey v. Control Data Corp.*, 603 F.2d 724, 729 (8th Cir. 1979), cert. den., 444 U.S. 1017, 100 S.Ct. 670, 62 L.Ed.2d 647 (1980) (Delaware law); *Grossman v. Johnson*, 89 F.R.D. 656, 662–663 (D.Mass.1981) (Maryland law);

*Abramowitz v. Posner*, 513 F.Supp. 120, 125–126 (S.D.N.Y.1981) (Delaware law).

 Taking into account the clear weight of authority, and the provision under Iowa law for delegation of plenary powers of the full board of directors to a duly authorized committee of the board, Section 496A.39 of the Iowa Code; see *Genzer v. Cunningham*, 498 F.Supp. 682, 686–688 (E.D.Mich.1980), the Court is of the opinion that the Iowa courts would apply the business judgment rule and preclude judicial interference with the decision of an independent disinterested corporate committee to forego litigation of derivative claims. However, upon consideration of the high standard of care to which corporate fiduciaries are subject in Iowa and the protective attitude displayed by the state's courts toward the rights of minority shareholders, see, e. g., *First Nat'l Bank v. One Craig Place*, 303 N.W.2d 688 (Iowa 1981); *Rowen v. LaMars Mutual*, 282 N.W.2d 639 (Iowa 1979), the Court is persuaded that the Iowa Supreme Court would apply the more stringent version of the deferential business judgment rule expounded by the Delaware Supreme Court in *Zapata Corp. v. Maldonado*, 430 A.2d 779 (Del.S.Ct.1981).

The *Zapata* case seeks to steer a middle course between those cases which yield to the independent judgment of a board committee and those which would permit unbridled plaintiff stockholder control of a derivative action. *Id.* at 786.

> If, on the one hand, corporations can consistently wrest bona fide derivative actions away from well-meaning derivative plaintiffs through the use of the committee mechanism, the derivative suit will lose much, if not all, of its generally-recognized effectiveness as an intra-corporate means of policing boards of directors.... If, on the other hand, corporations are unable to rid themselves of meritless or harmful litigation and strike suits, the derivative action, created to benefit the corporation, will produce the opposite, unintended result.

*Id.* at 786–787.

In an effort to find the balancing point "where bona fide stockholder power to

bring corporate causes of action cannot be unfairly trampled on by the board of directors, but the corporation can rid itself of detrimental litigation" *Id.* at 787, the Delaware Court went beyond mere adherence to the business judgment doctrine and required the court, in addition to inquiring into the independence and good faith of the committee and the bases supporting its conclusions, to apply its own business judgment in determining whether a motion for summary judgment should be granted because of the committee decision.

■ In exercising its own business judgment, the Court should carefully consider and weigh the strength of the corporate interest in dismissal when faced with a non-frivolous lawsuit and, when appropriate, give special consideration to matters of law and public policy in addition to the corporation's best interests. *Id.* at 789. Ethical, commercial, promotional, public and employee relations, and fiscal, as well as legal factors should be considered in analyzing the committee's decision to terminate a particular lawsuit, and in exercising the court's own business judgment. *Id.* at 788.

When each side has had an opportunity to make a record on the motion, a motion for summary judgment is a proper vehicle for deciding these issues, if the movant meets the normal burden under Rule 56 as interpreted by the Eighth Circuit Court of Appeals. See *Id.*

Plaintiffs argue that the business judgment rule is inapposite in cases such as the one at bar where director fraud is alleged and where the nominal corporate defendant is closely held and thus evades the strictures of federal and state securities laws regulating publicly held entities. An allegation of illegal conduct on the part of board members has no relevance in the context of judicial review of the conclusion of a disinterested committee of directors that dismissal of a derivative action will benefit the corporation. See *Abbey v. Control Data Corp.*, 460 F.Supp. 1242, 1245 (D.Minn.1978), aff'd, 603 F.2d 724 (8th Cir. 1979), cert. den., 444 U.S. 1017, 100 S.Ct. 670, 62 L.Ed.2d 647 (1980). With reference to the argument

that the business judgment rule should not function to insulate the determinations of a special litigation committee where a closely held corporation is involved, the Court is satisfied that the welfare of minority shareholders is adequately protected under the *Zapata* test.

■ As articulated by the *Zapata* court, the four-pronged analysis to be applied in evaluating a dismissal motion premised upon an independent litigation committee's exercise of business judgment requires a judicial assessment of: (1) the procedural propriety of a complaining shareholder's initiation of suit; (2) whether the board committee is endowed with the requisite corporate power to seek dismissal of a derivative suit; (3) whether the movants have adequately demonstrated the disinterest, independence and good faith of committee members, the bases for the conclusions of such members and the appropriateness and sufficiency of their investigative techniques; and (4) whether, in the Court's exercise of its own independent business judgment, dismissal of derivative counts is warranted. *Zapata Corp. v. Maldonado*, 430 A.2d at 784–789. Each prong will be discussed in numerical order.

(1) *Proper Initiation of Derivative Suit.*

■ The first element of the Zapata test will be discussed with particular reference to the preliminary demand requirement outlined in Federal Rule of Civil Procedure 23.1. *Cf. Zapata v. Maldonado*, 430 A.2d at 784–785 (requirement of initial shareholder demand construed under state law). See *Grossman v. Johnson*, 89 F.R.D. at 659–661. Under the circumstances of this case, facts evincing the participation of a majority of the board in the transactions complained of, and the consequent futility of a shareholder demand, excuse the plaintiffs' failure to first request that the defendant directors vindicate the rights of the corporation prior to themselves filing suit. See *Clark v. Lomas & Nettleton Finance Corp.*, 625 F.2d 49, 53 (5th Cir. 1980), cert. den., 450 U.S. 1029, 101 S.Ct. 1738, 68 L.Ed.2d 224 (1981); *Elfenbein v. Gulf &*

*Western Indus.*, 590 F.2d 445, 450 (2d Cir. 1978) (per curiam); *Cramer v. GTE Corp.*, 582 F.2d 259, 276–277 (3rd Cir. 1978), cert. den., 439 U.S. 1129, 99 S.Ct. 1048, 59 L.Ed.2d 90 (1979).

### (2) *Whether Board's Authority was Properly Delegated.*

■ The Court finds that the authority of the R & T board was properly delegated to the special litigation committee pursuant to Section 496A.39 of the Iowa Code. The committee was vested by the board with full and unconditional authority to act on its behalf in considering the position the corporation should take with respect to the derivative litigation. See *Auerbach v. Bennett*, 47 N.Y.2d 619 at 625, 393 N.Y.2d 994 at 997, 419 N.Y.S.2d 920 at 923. See also Brown and Phillips, The Business Judgment Rule: Burks v. Lasker and Other Recent Developments, 6 J. Corp. Law 453, 471 (1981).

It is plaintiffs' contention that the committee's decision not to bring an action against corporate personnel accused by certain shareholders of wrongdoing exceeds the scope of its statutorily delegated authority, in that this decision in effect constituted a ratification of such wrongdoing. Such an argument, however, misapprehends the underlying purpose of a derivative action, which is to vindicate wrongs to the corporation rather than the public. Thus the focal point herein is not the legality or illegality of the directorial conduct complained of in Counts 5 through 8, but the legitimacy of the committee's opinion that further litigation of the foregoing counts would not serve the interests of the R & T. See *Abbey v. Control Data Corp.*, 603 F.2d at 730; *Rosengarten v. ITT*, 466 F.Supp. 817, 824 (S.D.N.Y.1979); *Gall v. Exxon*, 418 F.Supp. at 519. The power to formulate such a decision was properly delegated to the SLC under Iowa law.

### (3) *Independence and Good Faith of the SLC, Adequacy of Investigative Procedures and Bases for Conclusions.*

■ Plaintiffs challenge (A) the method of selection of committee members utilized by the R & T board and the independence of these members, (B) the adequacy of their investigative procedures, and (C) the bases for their decision to discontinue suit on behalf of the corporation. No question as to the good faith of Messrs. Marshall and Chrystal has been raised by plaintiffs. Thus the Court finds that all the requirements of the third prong of the *Zapata* test have been met, except that plaintiffs are entitled to additional discovery before the Court can decide if there are adequate bases for the committee's decision.

### A. *Independence of the Committee.*

There is no suggestion that the two disinterested directors, both of whom were appointed after the transactions outlined in Counts 4 through 8, had any prior interest in the corporation or were otherwise interested in said transactions in a manner calculated to impair their unbiased exercise of business judgment in furtherance of the corporation's welfare. Instead, while conceding that no direct conflict of interest exists and that no pecuniary motive can be attributed to committee members, plaintiffs attack the integrity of the selection process and the resultant inability of Chrystal and Marshall to objectively investigate the matters alleged in the derivative counts.

Plaintiffs rely upon the adverse implications to be drawn from personal relationships or other societal affinities extant among the appointees and the defendant directors. Because of these connections, plaintiffs maintain that neither Marshall nor Chrystal was in a position to evaluate in an unbiased fashion the relative merits of the derivative claims. In addition, plaintiffs argue that an inherent "structural bias" engendered by the fact that committee members were selected by the directors whose actions they were to investigate inevitably renders suspect their conclusions regarding the wisdom of pursuing such claims.

Examination of the affidavits and other documentary evidence produced by all parties discloses no triable issue of fact con-

cerning the independence of the committee. There is no particularly close relationship between either Marshall or Chrystal on the one hand and the defendant directors on the other. Allegations of Mr. Chrystal's natural bias in favor of the directors, whether by virtue of his wealth or understanding of the "significance of family control of businesses," are not alone demonstrative of his lack of objectivity. The remaining allegations of structural bias are not supported by tangible evidence of an untoward interest on the part of committee members in the outcome of the present litigation, and hence do not suffice to invalidate the determinations of the committee. *Zapata Corp. v. Maldonado*, 430 A.2d at 786. See *Abramowitz v. Posner*, 513 F.Supp. at 127.

### B. *Adequacy of Investigative Procedures.*

In disputing the sufficiency of the committee's investigative techniques, plaintiffs contend that the committee met infrequently and posited undue reliance in the advice of counsel and the information obtained from the defendant directors. Further, plaintiffs complain of Mr. Chrystal's lack of knowledge, when deposed, of the amount of legal fees involved in Count 5 and of certain legal terminology.

Upon review of the record, the Court is satisfied that no issue of material fact has been generated with respect to the adequacy of the committee's investigation. To the contrary, the record indicates that the line of inquiry followed by the committee was comprehensive in scope.

It is clear from their report and uncontroverted affidavits that the members of the SLC explored the substance of each of the counts under discussion. Chrystal and Marshall met formally on four occasions and conferred frequently by telephone. In addition, special counsel, Professor Chirelstein of Yale University and Ms. Julia Mears, an Iowa City attorney, were retained to conduct an independent examination of all facts relevant to the disputed transactions and to advise the committee on the legal issues raised in the derivative counts. Each committee member in addition undertook to familiarize himself with the facts of this case through review of every deposition taken as well as numerous corporate documents, and through interviews with seven of the defendant directors. Mr. Chrystal consulted with counsel for plaintiffs, while Mr. Marshall conferred with attorneys for both the individual and corporate defendants.

Thus on the basis of its own opinion as derived from an independent investigation of the facts and circumstances surrounding plaintiffs' allegations, and of the plenary conclusions of Professor Chirelstein and Ms. Mears, the committee compiled a report setting forth its determinations and advising the corporation to defend against the charges asserted in Count 4 and to move for dismissal of Counts 5 through 8. It is therefore apparent that although the committee relied in part upon the factual and legal findings made by special counsel, its independent participation in the investigatory process was substantial. See *Maldonado v. Flynn*, 485 F.Supp. 274, 278 (S.D.N.Y. 1980); *Rosengarten v. ITT Corp.*, 466 F.Supp. at 824–825. Notwithstanding Mr. Chrystal's unfamiliarity with legal jargon or his inability to recall the amount of corporate expenditures at issue in Count 5 at the time of his deposition, the Court is satisfied that the procedures and methodologies employed by the SLC were reasonably calculated to ascertain the best interests of the corporation.

### C. *Bases for the Committee's Conclusions.*

Plaintiffs last assail the merits of the committee's report, contending that the quality of the report is less than adequate and that the conclusions drawn therein are manifestly unreasonable given the facts ascertained by Marshall and Chrystal during the investigatory process. Similar arguments are delineated in plaintiffs' motions to strike the report of the litigation committee and to reconsider the Magistrate's discovery order of April 22, 1981 limiting

inquiry into the rationale for the committee's decision to recommend dismissal of Counts 5 through 8 on behalf of the corporation.

In light of the Court's adoption of the precedential standard articulated in *Zapata*, the Court is of the opinion that further development of the record with regard to the committee's determinations is necessary. Since Magistrate Longstaff's ruling preceded the issuance of the *Zapata* decision, the restrictions imposed on discovery therein were warranted under applicable case law. Under *Zapata*, however, plaintiff shareholders are entitled to limited discovery into the bases supporting the committee's conclusions in order to challenge the reasonableness of such conclusions. *Zapata Corp. v. Maldonado*, 430 A.2d at 788–789.

■ Furthermore, the defendants bear the burden of proving the reasonableness of the committee's conclusions. *Id.* at 788. At least one inconsistency in the record, the committee's disregard of Professor Chirelstein's opinion that Count 5 was worthy of continued litigation, raises some question as to the premise for the committee's recommendation that dismissal of Count 5 was appropriate.

Before deciding whether defendants have shown reasonable bases for the committee decision and proceeding to the final prong of the *Zapata* test, which mandates the Court's exercise of its independent business judgment in determining whether defendants' motions for summary judgment should be granted, the Court will therefore permit plaintiffs to make limited inquiry by deposition of SLC members Marshall and Chrystal within thirty days concerning the objective factors underlying their decision to urge dismissal of Counts 5–8. Questions regarding the mental processes of the foregoing individuals are beyond the scope of permissible discovery. In other words, plaintiffs may inquire into *what* factors entered into the committee's decision, but not *why* such factors were considered or not considered.

Upon expiration of the thirty-day period, plaintiffs shall submit, within fifteen days, a supplemental resistance to defendants' respective motions for summary judgment, setting forth facts and authorities in support of their contention that the findings of the SLC were unreasonable as disclosed by the supplemental discovery. The defendants shall have ten days to respond. At that juncture, the Court shall resolve the issues left undecided in determining the applicability of the business judgment rule as defined by the Delaware Supreme Court in *Zapata Corp. v. Maldonado*, supra, and give further consideration to plaintiffs' cross-motion for summary judgment on Count 5 and motion to strike the report of the SLC.

IT IS THEREFORE ORDERED that the defendants' respective motions for summary judgment on Count One of the amended complaint shall be submitted to the Court for trial along with the case on its merits.

IT IS FURTHER ORDERED that the motions for summary judgment with respect to Counts Two and Three, filed by the corporate and individual defendants, are hereby granted.

IT IS FURTHER ORDERED that the related issues raised in Count Four concerning the motivation of the R & T board with respect to establishment of the voting trust and the propriety of the purpose underlying such establishment shall be submitted for trial along with the case on its merits under the rulings made herein.

IT IS FURTHER ORDERED that the voting trust agreement shall be construed as complying with Sections 496A.32 and .33 of the Iowa Code in the following particulars: (1) certificates repurchased by the R & T shall be treated as treasury stock, thus barring the trustees from voting shares in which the equitable interests are held by the R & T as a participant in the voting trust, and (2) the R & T shall not exercise additional rights conferred upon certificateholders in the voting trust agreement with respect to repurchased certificates, as discussed in this Order.

IT IS FURTHER ORDERED that plaintiffs' cross-motion for summary judgment as to claims raised in Count Four of the amended complaint is hereby granted as to the following provisions of the voting trust agreement deemed invalid by the Court:

(1) Section 10.3;

(2) That portion of Section 18 which recites "provided that the company shall consent to the amendment"; and

(3) Provisions in Section 8.4 for corporate indemnification and reimbursement of trustees.

The foregoing provisions shall be severed from the trust agreement in accordance with Section 20.2 thereof. In all other respects the Voting Trust Agreement is valid.

IT IS FURTHER ORDERED that plaintiffs' motion for reconsideration of Magistrate Longstaff's discovery Order of April 22, 1981 is hereby granted, but only insofar as limited discovery may be taken by deposition, within thirty (30) days from the date of this Order, of SLC members Burke Marshall and John Chrystal, for the sole purpose of ascertaining the factors upon which their joint decision to seek dismissal of derivative counts Five through Eight rested. No inquiry into the mental processes of Messrs. Marshall and Chrystal may be made. Plaintiffs shall have fifteen (15) days from the expiration of the thirty-day period in which to file a supplemental resistance setting forth facts and authorities corroborative of their assertion that the conclusions of the committee with respect to Counts Five through Eight are manifestly unreasonable and without foundation in fact. Defendants shall have ten days to respond, at which time the Court shall deem the matter fully submitted.

Consideration of defendants' motions for summary judgment on Counts Five through Eight pursuant to the business judgment rule, as well as plaintiffs' cross-motion for summary judgment on Count Five and their motion to strike the report of the special litigation committee shall therefore be stayed until such additional discovery and briefing is completed.